FILED

2020 Sep-11  PM 02:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **OHIO SECURITY INSURANCE COMPANY and THE OHIO CASUALTY INSURANCE COMPANY,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **CIVIL ACTION NO. 2:19-CV-1656-MHH** |
| **v.** | ) ) | |
| **SUPERIOR LAND DESIGNS, LLC, et al.** | ) ) ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE DUTY TO DEFEND AND MEMORANDUM OF LAW IN SUPPORT

Plaintiffs Ohio Security Insurance Company ("Ohio Security") and The Ohio Casualty Insurance Company ("Ohio Casualty") (collectively, the "Insurers") move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the basis that there is no genuine issue of material fact and the Insurers are entitled to a judgment as a matter of law that under the terms of their liability insurance contracts with Superior Land Designs, LLC ("Superior") they have no duty to defend Superior with respect to the Underlying Lawsuits arising out of the October 31, 2016 Colonial Pipeline Company ("Colonial") gasoline release and explosion. In support of their Motion, the Insurers rely on this Memorandum of Law in Support of Motion for Summary Judgment on the Duty to Defend.

## **INTRODUCTION**

The insurance contracts at issue in this case contain two common, broadly interpreted exclusions: (1) the professional services exclusion and (2) the pollution exclusion. Based upon the allegations of the underlying complaints, both exclusions apply and bar coverage for Superior's claims. Because the policies exclude coverage for the claims, the Insurers do not owe any duty to defend Superior.

The Policies' professional services exclusions exclude liability resulting from inspection and supervisory activities. The plaintiffs in the Underlying Lawsuits allege that Superior was hired to perform inspection and supervisory services for the repair and remediation of a September 2016 Colonial gasoline pipeline leak in Shelby County, Alabama. All the underlying plaintiffs claim that Superior was supervising an excavation crew working on the repair of the pipeline. During this work, an excavator struck the pipeline which ruptured and leaked, and then exploded, injuring the underlying plaintiffs or their property. The underlying plaintiffs claim that Superior's negligence caused their damages. The Policies' professional services exclusions exclude coverage for liability resulting from the exact activities Superior was performing at the time of the gasoline release and explosion.

The Policies also contain pollution exclusions that exclude liability for bodily injury and property damage arising out of the release of "pollutants" at any premises

2

on which an insured (Superior) is performing operations to clean up, remove or in any way respond to pollutants. Here, the underlying plaintiffs acknowledge their injuries arose during Superior's efforts to respond to and repair the prior September 2016 gasoline leak in the Colonial pipeline. Because gasoline is a "pollutant," the Policies' pollution exclusions also exclude coverage.

The question for the Court is simple: do the claimed damages in the Underlying Lawsuits arise from Superior's inspection and supervision of activities arising out of the September 2016 gasoline leak repair? If the answer is "yes," then Ohio Security and Ohio Casualty have no duty to defend Superior with respect to the Underlying Lawsuits under the Policies.

## STATEMENT OF UNDISPUTED FACTS

1.    Colonial owns and operates a petroleum pipeline system that transports certain petroleum products from the Gulf Coast to various locations in the South and along the East Coast (the "Pipeline"). (Doc. 1-3, p. 3, ¶ 6; Doc. 1-4, p. 4, ¶ 11; Doc. 1-5, p. 4, ¶ 12; Doc. 1-6, p. 3, ¶ 5; Doc. 1-7, p. 4, ¶ 17).

2.    On or about September 9, 2016, in Shelby County, Alabama, more than 300,000 gallons of gasoline leaked from the Pipeline (the "September 2016 Leak"). (Doc. 1-3, p. 4, ¶ 10; Doc. 1-4, p. 4, ¶ 15; Doc. 1-5, p. 4, ¶ 16; Doc. 1-6, p. 4, ¶ 9; Doc. 1, p. 7, ¶ 29, Doc. 33, p. 7, ¶ 29).

3.      Following the discovery of the September 2016 Leak, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued a Corrective Action Order requiring Colonial to shut down a portion of the Pipeline and take necessary corrective action to protect the public, property, and environment from hazards associated with the leak. (Doc. 1-3, p. 4, ¶ 11; Doc. 1-4, p. 5, ¶ 17; Doc. 1-6, p. 4, ¶ 10).

4.      Following the September 2016 Leak and PHMSA's Corrective Action Order, Colonial attempted to repair the Pipeline and remediate the gasoline leak, including excavating and accessing segments of the Pipeline which were not located in the immediate vicinity of the site of the September 2016 Leak. (Doc. 1-3, p. 5, ¶ 14; Doc. 1-4, p. 5, ¶ 20; Doc. 1-6, p. 5, ¶ 13; Doc. 1-5, p. 4, ¶ 17; and Exhibit A, Doc. 65[1]).

---

[1] This is a National Transportation Safety Board ("NTSB") report that was issued on December 10, 2019 regarding the October 31, 2016 Release. Facts from government agency reports can be judicially noticed by this court. *See Mobil Oil Corp. v. Tennessee Val. Auth.*, 387 F. Supp. 498, 516 (N.D. Ala. 1974) (holding that the court could take judicial notice of TVA annual reports).

In pertinent part, the NTSB Report states: "At the time of the accident, the excavation being performed was to expose a series of TOR fittings on Line 1 in preparation for upcoming maintenance work to inject nitrogen into Line 1 during the removal of a temporary bypass pipe used to repair a previous leak…The previous leak on Line 1 occurred September 9, 2016, at a location about 5.5 miles downstream (northeast) of the accident site." (Doc. 65, p. 5). This corroborates allegations in the Underlying Lawsuits attributing the Release to efforts to respond to the effects of the September Leak. Additional support for the fact that the Release was caused by efforts to respond to the effects of the September Leak can be found in citations to Superior's Answer in paragraphs 5 and 6 below, wherein Superior admitted that the excavation work being done at the time of the Release was in response to the September Leak.

5.     Colonial hired L.E. Bell Construction, Inc. ("L.E. Bell") to perform excavation and repairs of the Pipeline. (Doc. 1-3, p. 6, ¶ 15; Doc. 1-4, p. 6, ¶ 21; Doc. 1-5, p. 4, ¶ 17; Doc. 1-6, p. 5, ¶ 14; Doc. 1, p. 7, ¶ 30, Doc. 33, p. 7, ¶ 30).

6.     During September and October 2016, L.E. Bell assigned multiple crews in the Shelby County area to conduct excavation and repair work. (Doc. 1-3, p. 6, ¶ 15; Doc. 1-4, p. 6, ¶ 21; Doc. 1-6, p. 5, ¶ 14; Doc. 1, p. 7, ¶ 31, Doc. 33, p. 7, ¶ 31).

7.     Colonial also hired Superior as a third-party inspector to oversee, direct, and/or supervise the excavation and repair work performed by the L.E. Bell Crew. (Doc. 1-3, p. 8, ¶ 21; Doc. 1-4, p. 7, ¶ 25; Doc. 1-6, p. 6, ¶ 19; Doc. 1-5, p. 5, ¶ 19; Doc. 1-7, p. 4, ¶ 20).

8.     As a third-party inspector, Superior shared Colonial's duty to ensure the excavation and repair work was performed in a safe manner in compliance with federal rules and regulations, Alabama state law, industry standards, and Colonial's own procedures. (Doc. 1-3, p. 8, ¶ 22; Doc. 1-4, p. 7, ¶ 26; Doc. 1-5, p. 5, ¶ 20; Doc. 1-6, p. 6, ¶ 20).

9.     Superior assigned its agent/servant/employee Chris Covey to inspect and direct the site of the L.E. Bell Crew's excavations occurring on October 31, 2016. (Doc. 1-3, p. 9, ¶ 26; Doc. 1-4, p. 8, ¶ 29; Doc. 1-5, p. 5, ¶ 23; Doc. 1-6, p. 7, ¶ 23).

10.     Covey was responsible for directing excavation activities and ensuring they were performed in a safe manner. *Id*.

11.     Covey had a duty to stop work if the excavations were not safe or if any unsafe practices occurred. *Id*.

12.     On October 31, 2016, Covey, on behalf of Superior, was present at the CR-251 dig site as the third-party inspector. (Doc. 1-3, p. 10, ¶ 32; Doc. 1-4, p. 9, ¶ 34; Doc. 1-5, p. 6, ¶ 28; Doc. 1-6, p. 8, ¶ 28).

13.     Covey was the only inspector present at the site on October 31, 2016. *Id*. The underlying plaintiffs allege that under Covey's direction, the L.E. Bell operator began digging within close proximity of the Pipeline. (Doc. 1-3, p. 14, ¶ 40; Doc. 1-4, p. 10, ¶ 41; Doc. 1-5, p. 7, ¶ 32; Doc. 1-6, p. 9, ¶ 32).

14.     During this dig, the excavator struck the Pipeline, resulting in a release of flammable gasoline. (Doc. 1-3, p. 14, ¶¶ 41-43; Doc. 1-4, p. 10-11, ¶¶ 42-44; Doc. 1-5, p. 5, ¶ 18, p. 7, ¶¶ 33-34; Doc. 1-6, p. 9, ¶¶ 33-35; Doc. 1-7, p. 4, ¶ 21).

15.     The gasoline ignited, resulting in an explosion that caused bodily injury, loss of life, and property damage (the "Release"). *Id*.

16.     The Underlying Lawsuits allege that the Release was the result of, among other things, Superior's "fail[ure] to provide adequate oversight" of the work, "fail[ure] to properly … supervise its agents/servants/employees," and "directing and/or permitting the performance of actions and work practices that were not safe

and were in violation of federal [and state] rules and regulations." (Doc. 1-3, p. 15-16, ¶ 50, p. 32, ¶ 72; Doc 1-6, p. 21, ¶ 61).

17.     The Underlying Lawsuits allege Superior and Covey failed to conduct an adequate inspection of the excavation site, prepare an adequate plan for the excavation, perform a job hazard analysis, enforce all applicable regulations and procedures, and conduct a safety meeting to identify hazards and what actions should be taken in the event the Pipeline was struck. (Doc. 1-3, p. 13, ¶ 37; Doc. 1-4, p. 10, ¶ 38).

18.     The Underlying Lawsuits also allege Superior's negligence proximately caused the plaintiffs' injuries. (Doc. 1-3, p. 33-34, ¶¶ 72-73, 75; Doc. 1-4, p. 17, ¶ 89; Doc. 1-5, p. 24, ¶ 79; Doc. 1-6, p. 20-22, ¶¶ 61-62, 64; Doc. 1-7, p. 6, ¶ 33).

19.     As a result of the Release, certain lawsuits were brought against Superior, and others, seeking damage. These lawsuits include *Delaughder, et al. v. Colonial Pipeline, et al.*, Case No. 2:19-cv-00923 in the U.S. District Court for the Northern District of Alabama ("*Delaughder* Complaint"); *Gentry, et al. v. Colonial Pipeline, et al.*, Case No. 58-CV-2018-900789 in the Circuit Court of Shelby County, Alabama ("*Gentry* Complaint"); *Webster et al. v. Colonial Pipeline et al.*, Case No. 58-CV-2017-901175 in the Circuit Court of Shelby County, Alabama ("*Webster* Complaint"); *Willingham v. Colonial Pipeline et al.*, Case No. 2:19-cv-

01507 in the U.S. District Court for the Northern District of Alabama ("*Willingham*

Complaint*"); and *Wright et al. v. Colonial Pipeline et al.*, Case No. 58-cv-2018-

901017.00 in the Circuit Court of Shelby County, Alabama ("*Wright* Complaint").

(Doc. 1-3; Doc. 1-4; ECF 1-5; ECF 1-6; ECF 1-7). These lawsuits will be referred

to as the "Underlying Lawsuits."

20.    Ohio Security issued a commercial general liability insurance policy

bearing policy number BKS(17)56089339, for the policy period from July 5, 2016

to July 5, 2017, to Superior ("Ohio Security Policy"). (Doc. 1-9, p. 47).

21.    The Ohio Security Policy was countersigned and delivered to Superior

in the State of Georgia. *Id*.

22.    Superior is the named insured under the Ohio Security Policy. *Id*.

23.    Ohio Security's Policy describes Superior's business as "ENGINEER

INSPECTING PIPELINES." *Id*.

24.    The Ohio Security Policy contains a Pollution Exclusion that provides

that "This insurance does not apply to:"

> **(1)** "Bodily injury" or "property damage" arising out of the
> actual, alleged or threatened discharge, dispersal, seepage,
> migration, release or escape of "pollutants":
>
> * * *
>
> **(e)** At or from any premises, site or location on which any
> insured or any contractors or subcontractors working
> directly or indirectly on any insured's behalf are
> performing operations if the operations are to test for,

8

> monitor, clean up, remove, contain, treat, detoxify or
> neutralize, or in any way respond to, or assess the effects
> of, "pollutants".

*Id*. at pp. 63-64.

25.    The Ohio Security Policy defines "Pollutants", in relevant part, to mean

"any solid, liquid, gaseous or thermal irritant or contaminant, including smoke,

vapor, soot, fumes, acids, alkalis, [and] chemicals …." *Id*. at p. 76.

26.    The Ohio Security Policy also contains a Professional Liability

Exclusion that states:

> **EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS
> PROFESSIONAL LIABILITY**
>
> The following exclusion is added to Paragraph **2. Exclusions**
> of **Section I - Coverage A - Bodily Injury And Property
> Damage Liability** and Paragraph **2. Exclusions** of **Section I
> - Coverage B - Personal And Advertising Injury Liability:**
>
> This insurance does not apply to "bodily injury", "property
> damage" or "personal and advertising injury" arising out of
> the rendering of or failure to render any professional services
> by you or any engineer, architect or surveyor who is either
> employed by you or performing work on your behalf in such
> capacity.
>
> Professional services include:
>
> **1.** The preparing, approving, or failing to prepare or approve,
> maps, shop drawings, opinions, reports, surveys, field orders,
> change orders or drawings and specifications; and
>
> **2.** Supervisory, inspection, architectural or engineering
> activities.

> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

*Id.* at p. 82.

27.     Ohio Casualty issued a commercial umbrella insurance policy bearing policy number USO(17)56089339, for the policy period from July 5, 2016 to July 5, 2017, to Superior ("Ohio Casualty Policy"). (Doc. 1-10, p. 29).

28.     The Ohio Casualty Policy was countersigned and delivered to Superior in the State of Georgia. *Id.*

29.     Superior is the named insured under the Ohio Casualty Policy. *Id.*

30.     The Ohio Casualty Policy contains a specific Pollution Exclusion that provides that "insurance does not apply to"

> **L. 1.** "Bodily injury", "property damage", "personal injury", "advertising injury" or "personal and advertising injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.
>
> * * *
>
> Paragraph **1.** of this exclusion **L.** does not apply to the following:
>
> * * *

**(4)**   "Bodily injury" or "property damage" arising out of the discharge, dispersal, seepage, migration, release or escape of "pollutants" at or from any premises, site or location on which any "Insured" or any contractors or subcontractors working directly or indirectly on any "Insured's" behalf are performing operations if the "pollutants" are not brought on or to the premises, site of location in connection with such operations by such "Insured", contractor or subcontractor.

* * *

However, the exceptions to this exclusion **L.** in paragraphs … **(4)** … above apply only to the extent that insurance is afforded for such "bodily injury" or "property damage" by "underlying insurance". Provided, however, that the coverage afforded by this policy will be no broader than the coverage afforded by such "underlying insurance":

Regardless of the extent of "underlying insurance", none of the exceptions to this exclusion **L.** in paragraphs … **(4)** … above apply with respect to "bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape or (*sic*) "pollutants":

* * *

**(iii)**   At or from any premises, site or location on which any "Insured" or any contractors or subcontractors working directly or indirectly on any "Insured's" behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

*Id*. at p. 70.[2]

---

[2] Here, the exception to the exception applies, because the Underlying Lawsuits allege that at the time of the Release, Superior was performing operations to respond to the September Leak.

31.    The Ohio Casualty Policy defines "Pollutants", in relevant part, to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, [and] chemicals …." *Id.*

32.    Pursuant to an endorsement, the Ohio Casualty Policy also contains an "ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY EXCLUSION" which states:

> This insurance does not apply to:
>
> Any liability arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.
>
> Professional services include:
>
> 1. the preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
>
> 2. supervisory, inspection, architectural or engineering activities.
>
> This exclusion applies even if the "claims" against any "Insured" allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that "Insured," if the "occurrence," "offense" or other act, error or omission involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.
>
> This endorsement does not change any other provision of the policy.

*Id.* at p. 53.

33.     Superior sought a defense of the Underlying Lawsuits from Ohio Security and Ohio Casualty under the Policies. (Doc. 1, p. 11, ¶ 46; Doc. 33, p. 10, ¶ 46).

34.     Ohio Security and Ohio Casualty agreed to participate in the defense of Superior against the Underlying Lawsuits under a full reservation of rights. (Doc. 1, p. 11, ¶ 47; Doc. 33, p. 10 ¶ 47).[3]

## **STANDARD OF REVIEW**

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In determining whether a genuine issue for trial exists, the court must view the evidence in the light most favorable to the non-movant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing

---

[3] Superior's professional liability insurer is also providing Superior a defense in the Underlying Lawsuits pursuant to the coverage it provides.

court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing 'party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## ARGUMENT AND CITATION TO AUTHORITY[4]

### A.   There Is No Duty to Defend If There Is No Coverage.

To determine whether a claim against an insured falls within the insured's coverage, triggering the insurer's duty to defend, courts compare the allegations of the underlying complaint against the provisions of the policy. *See Travelers Prop. Cas. Co. of Am. v. Kansas City Landsmen*, L.L.C., 592 F. App'x 876, 881–82 (11th Cir. 2015). If the complaint against the insured does not assert any claim that could fall within the policy's coverage, the insurer is justified in refusing to defend. *See id*.

---

[4] Georgia law governs the interpretation of the Policies, because the Policies were delivered to Superior and its retail agent in Georgia. *See Lancer Ins. Co. v. Newman Specialized Carriers, Inc.*, 903 F. Supp. 2d 1272, 1278-79 (N.D. Ala. 2012) (holding that in determining which state's law applies in a contract dispute, Alabama follows the principle of *lex loci contractus*, applying the law of the state where the contract was formed, and when an insured's policy was delivered in Alabama, Alabama law applied); (Doc. 1-9, p. 23).

**B.     The Professional Services Exclusions Bar Coverage for Liability Arising Out of Supervisory or Inspection Activities.**

Based on the allegations in the Underlying Lawsuits, the Policies' professional services exclusions bar coverage for Superior's claims. The Policies' professional services exclusions exclude coverage for, among other things, liability arising out of the rendering or failure to render "professional services." The definition of "professional services," includes "supervisory, inspection, architectural or engineering activities." The Underlying Lawsuits all allege that Superior is liable for damages based on its negligence and failure to properly supervise, inspect, and/or direct L.E. Bell's excavation activities at the CR-251 site. (Doc. 1-3, p. 15-16, ¶ 50, p. 32, ¶ 72, p. 34, ¶ 75; Doc. 1-4, p. 17, ¶ 89; Doc. 1-5, p. 24, ¶ 79; Doc. 1-6, p. 20-22, ¶¶ 61-62, 64; Doc. 1-7, p. 6, ¶ 33).

Georgia courts have held that professional services exclusions, like the exclusions in the Policies, are unambiguous and enforceable. *See Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co.*, 297 Ga. App. 751, 755-56 (2009). For the exclusion to apply, a professional "must perform more than an ordinary task to furnish a professional service; the task must arise out of the individual's specialized knowledge or training." *Id.* at 756 (citations omitted). "[W]hether or not the [professional] drew upon his professional knowledge, experience and training is not the proper inquiry; the proper inquiry is whether he should have drawn upon that knowledge, experience, and training." *Id.* at 757.

15

In *Auto-Owners*, the Court of Appeals of Georgia reversed a trial court's denial of summary judgment to two insurers and ruled that they had no duty to defend their policyholders because the alleged negligence in the underlying complaint fell within the professional services exclusion. *Id*. at 755-57. The underlying claimant was a worker at a construction project who sustained severe burn injuries after contacting a live electrical wire while repairing a conduit. *Id.* at 752. The worker and his spouse sued ATI, the company that oversaw and managed the design and construction of the project. *Id*. at 752-53. ATI was insured by Auto-Owners. *Id*. at 751. The worker and his spouse also sued CTI, the company that ATI hired to serve as construction manager of the project. *Id*. at 751. The underlying claimants also sued the CTI representative serving as construction manager. *Id*. at 752. CTI was insured by State Farm. *Id*. at 751. The injured worker alleged that prior to commencing work on the electrical conduit, the construction manager, as CTI's employee or agent, and ATI's agent, assured the worker that the electrical conduit did not contain live wires. *Id.* at 752-755.

The court held that the professional services exclusions in both policies applied. *Id*. at 755-57. Thus, Auto-Owners did not owe a duty to defend ATI, and State Farm did not owe a duty to defend CTI. *Id*. The court determined that the case against ATI was not one of simple negligence based on a miscommunication, but rather that the allegations pertained to a failure to render a professional service,

16

specifically, a failure to properly supervise and manage construction of the project. *Id.* at 755. Further, as to CTI, the court noted that the construction manager had the direct responsibility to supervise activities on the project site to ensure the work was done safely, properly, and timely. *Id.* at 756. In fact, the construction manager was consulted about the conduit because of his "specialized knowledge" of the site and the industry. *Id.* The court held that because the worker sought the construction manager's knowledge as supervisor of the site, it was precisely the construction manager's failure to properly perform his supervisory function that caused the worker's injury. *Id.* at 757. Accordingly, the court held that the professional services exclusion applied. *Id.*

Similarly, in *Batson-Cook Co. v. Aetna Ins. Co.*, 200 Ga. App. 571 (1991), the Court of Appeals of Georgia considered whether a claim arising out of an insured construction manager's alleged negligence in performing supervisory duties was barred by a professional services exclusion. The court held that because the allegations pertained to the insured's rendering or failing to render the services it was retained to perform as a construction manager, the claim was barred by the professional services exclusion. *Id.* at 573. *See also Auto-Owners Ins. Co. v. Unit Owners Ass'n of Riverview Overlook Condominium, Inc.*, No. 1:13-CV-3012, 2014 WL 5465286, at *3 (N.D. Ga. Oct. 28, 2014) (holding that claim against general contractor, who was performing supervisory role and using special construction

knowledge to ensure safety and quality of work performed, was barred by professional services exclusion) and *Se. Testing & Eng'g, Inc. v. Sentinel Ins. Co., Ltd.*, No. 1:16-CV-03838-RWS, 2018 WL 2057355, at *4 (N.D. Ga. Mar. 20, 2018) (holding that claim involving conditioning process and testing services was barred by professional services exclusion).

Here, the Underlying Lawsuits allege that in September and October 2016, Colonial made efforts to repair the pipeline and remediate the September 2016 Leak. (Doc. 1-3, p. 6, ¶ 15; Doc. 1-4, p. 6, ¶ 21; Doc. 1-6, p. 5, ¶ 14; Doc. 1 p. 7, ¶ 31, Doc. 33, p. 7, ¶ 31). As part of these efforts, Colonial retained Superior as a "third-party inspector" to direct and supervise L.E. Bell's work, including the excavation work it was performing on October 31, 2016. (Doc. 1-3, p. 8, ¶ 21; Doc. 1-4, p. 7, ¶ 25; Doc. 1-6, p. 6, ¶ 19; Doc. 1-5, p. 5, ¶ 19; Doc. 1-7, p. 4, ¶ 20). As part of its work as a "third-party inspector," Superior was responsible for directing excavation activities and ensuring they were performed in a safe manner and in accordance with applicable laws and regulations. (Doc. 1-3, p. 8, ¶ 22; Doc. 1-4, p. 7, ¶ 26; Doc. 1-5, p. 5, ¶ 20; Doc. 1-6, p. 6, ¶ 20). The plaintiffs in the Underlying Lawsuits allegedly sustained bodily injury and/or property damage as a result of Superior's alleged failure to properly perform its inspection and supervisory duties, including its failure to provide adequate oversight of the work, failure to properly supervise its agents/servants/and/or employees, and improperly directing and/or permitting the

18

performance of actions and work practices that were not safe and were in violation of rules and regulations, among other failures. (Doc. 1-3, p. 15-16, ¶ 50, p. 32, ¶ 72, p. 34, ¶ 75; Doc. 1-4, p. 17, ¶ 89; Doc. 1-5, p. 24, ¶ 79; Doc. 1-6, p. 20-22, ¶¶ 61-62, 64; Doc. 1-7, p. 6, ¶ 33).

As in *Auto-Owners* and *Batson-Cook*, Superior was allegedly negligent in its inspection and supervisory activities. Superior was hired to guard against the exact type of accident that occurred – striking and rupturing the pipeline which lead to a deadly explosion. Accordingly, because the Underlying Lawsuits allege that Superior is liable for its failure to properly inspect and supervise L.E. Bell's excavation work, and the underlying plaintiffs' injuries and/or damages were the result of these failures, coverage for Superior for the alleged bodily injury and/or property damage sustained by the underlying plaintiffs is excluded under the Policies' professional services exclusions.

### C.    The Policies' Pollution Exclusions Bar Coverage for Superior.

The Policies' pollution exclusions also bar coverage for Superior because the underlying plaintiffs' bodily injury and property damage claims resulted from the gasoline release and explosion caused by Superior's efforts to remediate an earlier gasoline leak. In pertinent part, the Pollution Exclusion provides that the Ohio Security Policy does not apply to "bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release

or escape of "pollutants" at or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants." (Doc. 1-9, pp. 63-64). Similarly, the Ohio Casualty Policy includes a Pollution Exclusion that excludes coverage for "bodily injury" or "property damage" that "would not have occurred in whole or in part but for" the "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (Doc. 1-10, p. 70).[5]

### 1. Pollution Exclusions Are Enforceable and Unambiguous Under Georgia Law.

Pollution exclusions are enforced under Georgia law, and the Supreme Court of Georgia has held that pollution exclusions are unambiguous. *Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 721 (2016); *Reed v. Auto-Owners Ins. Co.*, 284 Ga. 286, 288 (2008). The Court has also applied pollution exclusions broadly, rejecting the notion that the pollution exclusion is limited to industrial

---

[5] The Ohio Casualty Policy's pollution exclusion has an exception for "bodily injury" or "property damage" that arises out of the release of "pollutants" "at or from any premises, site or location on which any "Insured" … [is] performing operations if the 'pollutants' are not brought on or to the premises, site or location in connection with such operations by such 'Insured.'" *Id*. However, the Ohio Casualty Policy further states that the exception does not apply to such pollution-based injuries "[a]t or from any premises, site or location on which any 'Insured' … [is] performing operations if the operations are to … in any way respond to, … the effects of, 'pollutants.'" *Id*.

and/or environmental harm. *Smith*, 298 Ga. at 720. Georgia courts have applied pollution exclusion clauses outside of the context of traditional environmental pollution, including in personal injury cases. *Id*. at 720-21 (holding that pollution exclusion barred coverage for alleged personal injuries arising out of exposure to lead paint at property/apartment owned by insured). *See also Reed*, 284 Ga. at 288 (holding that pollution exclusion barred claim for injury caused by carbon monoxide) and *Truitt Oil & Gas Co., Inc. v. Ranger Ins. Co.*, 231 Ga. App. 89, 90 (1998) (holding that pollution exclusion barred claim for damages caused by leaking gasoline).

Further, gasoline has been explicitly held to constitute a "pollutant" under Georgia law. The Policies define the term "pollutants," in relevant part, to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, [and] chemicals." In *Truitt Oil & Gas*, the Court of Appeals of Georgia determined that gasoline that had leaked from a storage container and, as a result, contaminated the surrounding environment, constituted a "pollutant" within the meaning of the subject policy, notwithstanding the fact that the policy did not specifically list "gasoline" in its definition of "pollutant." 231 Ga. App. at 90. The court stated, "'Pollutants' is clearly defined in the policy as including any liquid or gaseous contaminant. Gasoline is defined as a volatile flammable liquid hydrocarbon mixture blended form natural gas and petroleum." *Id*. (citations

omitted). As such, the flammable gasoline involved in both the September 2016 Leak and the Release, which is alleged to have caused bodily injury and property damage, similarly falls within the Policies' definition of "pollutants."

**2. Superior Was "Responding To" The Effects of Pollutants When the Release Occurred.**

The Underlying Lawsuits allege that Superior was responding to the effects of the September 2016 Leak of gasoline (i.e., a "pollutant") when the Release and explosion that caused the underlying plaintiffs' bodily injury and property damage occurred. (Doc. 1-3, p. 5, ¶¶ 14-15, p. 8 ¶ 21; Doc. 1-4, p. 5, ¶ 20, p. 6, ¶ 21, p. 7, ¶ 25; Doc. 1-6, p. 5, ¶¶ 13-14, p. 6, ¶ 19; Doc. 1-5, p. 4, ¶ 17, p. 5, ¶ 19; Doc. 1-7, p. 4, ¶ 20; Doc. 1 p. 7, ¶ 30, Doc. 33, p. 7, ¶ 30; Doc. 1 p. 7, ¶ 31, Doc. 33, p. 7, ¶ 31). Accordingly, the Policies' pollution exclusions bar coverage for Superior.

Although Georgia courts have not yet considered the specific wording of the applicable provisions of the Policies' pollution exclusions, other jurisdictions have upheld these provisions. In *ACSTAR Ins. Co. v. Clean Harbors, Inc.*, the court considered an almost identical pollution exclusion. 783 F. Supp. 2d 312, 322 (D. Conn. 2011). In that case, the insured subcontractor had been retained by a contractor to perform work "in furtherance of pollution testing and monitoring" the contractor was retained to conduct. *Id*. The court determined that "it [was] impossible to disentangle" the subcontractor's drilling work from the contractor's testing. *Id*. Thus, the court found that the pollution exclusion "bar[red] coverage of claims

22

arising from the process of testing and monitoring, which, in the case of underground pollution, must include boring to extract a sample to be tested and/or to install equipment to monitor for the presence of pollutants." *Id*.

Georgia courts broadly interpret the phrase "arising out of." *See JNJ Found. Specialists, Inc. v. D.R. Horton, Inc.*, 311 Ga. App. 269, 270 (2011) ("Importantly, the term 'arising out of' does not mean proximate cause in the strict legal sense, nor [does it] require a finding that the injury was directly and proximately caused by the insured's actions. Almost any causal connection or relationship will do."). The term "arising out of" in the context of insurance policy exclusions refers to the "but for" causation used to determine tort liability. *See Hays v. Ga. Farm Bureau Mut. Ins. Co.*, 314 Ga. App. 110, 114 (2012).

With regard to pollution exclusions, Georgia courts have held that it would be a mistake to read "but-for" causation to mean "sole causation." *Evanston Ins. Co. v. Sandersville R.R. Co.*, No. 5:15-CV-247 (MTT), 2016 WL 5662040, at *9 (M.D. Ga. Sept. 29, 2016). Rather, "but-for causation broadly defines causation, requiring only an act or omission without which the event would not have occurred." *Id*.

Here, the Underlying Lawsuits allege that, as a result of the September 2016 Leak, PHMSA ordered Colonial to engage in corrective action. (Doc. 1-3, p. 4, ¶ 11; Doc. 1-4, p. 5, ¶ 17; Doc. 1-6, p. 4, ¶ 10). Colonial promptly engaged in remediation efforts, to protect the public, property, and environment from hazards associated

with the leak, which included retaining L.E. Bell to repair and excavate and retaining Superior to supervise L.E. Bell's work. (Doc. 1-3, p. 5, ¶ 14, p. 16 ¶ 15, p. 8, ¶ 21; Doc. 1-4, p. 5, ¶ 20, p. 6, ¶ 21, p. 7, ¶ 25; Doc. 1-6, p. 5, ¶¶ 13-14, p. 6, ¶ 19; Doc. 1-5, p. 4, ¶ 17, p. 5, ¶ 19; Doc. 1-7, p. 4, ¶ 20). Thus, at the time of the Release, Superior was supervising L.E. Bell's excavation activities as part of Colonial's overall response and remediation efforts to address the September 2016 Leak, and the underlying plaintiffs' alleged injuries and/or damages "arose out of" these activities. Accordingly, because Superior was engaged in operations to "respond to" the effects of pollutants when the Release occurred, and the Release caused the underlying plaintiffs' alleged injuries and/or damages, the Policies' pollution exclusions bar coverage for Superior for such bodily injury and/or property damage.

## **CONCLUSION**

Plaintiffs respectfully request that the Court enter an Order granting summary judgment in favor of Plaintiffs and declare that Plaintiffs have no duty to defend Superior with respect to the Underlying Lawsuits. Additionally, Plaintiffs request that the Court grant such further relief as the Court deems just and proper.

This 11th day of September, 2020.

**ZELLE LLP**

*/s/ James V. Chin*
James V. Chin (*admitted pro hac vice*)
Ga. Bar No. 124827 (jchin@zelle.com)
Seth V. Jackson (*admitted pro hac vice*)
BBO #658669 (sjackson@zelle.com)
1201 W. Peachtree Street NW, Suite 610
Atlanta, GA 30309
(470) 867-3040
(612) 336-9100 Fax

*/s/ John W. Dodson*
**DODSON GREGORY, LLP**
John W. Dodson (jwd@dodsongregory.com)
(ASB-9724-D65J)
Michelle L. Crunk (mlc@dodsongregory.com)
(ASB-2967-I71C)
PO Box 530725
Birmingham, AL 35253
(205) 834-9171
(205) 278-8718 Fax

*Attorneys for OHIO SECURITY INSURANCE*
*COMPANY and THE OHIO CASUALTY*
*INSURANCE COMPANY*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 11th day of September, 2020, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ John W. Dodson*
OF COUNSEL