FILED

2020 Sep-18  PM 04:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| OHIO SECURITY INSURANCE COMPANY and OHIO CASUALTY INSURANCE COMPANY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:19-cv-01656-MHH |
| SPERIOR LAND DESIGNS, LLC, *et al.* Defendants. | ) ) ) | |

## DEFENDANT SUPERIOR LAND DESIGNS, LLC's BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE DUTY TO DEFEND

Defendant Superior Land Designs, LLC ("Superior") opposes Plaintiffs'

Motion for Summary Judgment on the Duty to Defend and respectfully shows the

Court as follows:

## INTRODUCTION

Plaintiffs issued insurance policies to Superior, a company that they described

as an "engineer inspecting pipelines," and then endorsed those policies to exclude

coverage for professional services performed by engineers, architects and surveyors.

This endorsement would have rendered coverage under the policies illusory,

something that Plaintiffs no doubt intended, but for the fact that Superior was not

performing engineering, architectural or surveying work when the accident at issue

occurred. Indeed, the independent contractor engaged by Superior to perform work on the project was not actually an engineer, architect or surveyor and never had been. Nor was the independent contractor performing professional services related to engineering, architecture, or surveying. For these reasons alone, the professional services exclusions in the Plaintiffs' policies do not apply.

Nor may Plaintiffs rely on the pollution exclusion in their policies to deny coverage for an explosion that occurred when an employee of another company struck an oil pipeline with a track hoe excavator. The pollution exclusions in the Plaintiffs' policies expressly apply to bodily injury or property damage arising out of the "discharge, dispersal, seepage, migration, release or escape of 'pollutants,'" not to an explosion caused by the ignition of gasoline during an excavation project miles away from the nearest pollution event. Because Superior was not performing work at the site of the pollution event, the pollution exclusion cannot apply. Furthermore, at the time of the accident, Superior was not actually performing work to respond to the pollution event anyway. And finally, the explosion did not "arise out of" that pollution event as would be required for Plaintiffs to invoke the pollution exclusion.

## RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

Superior does not dispute that many of the allegations referenced in Plaintiffs' Statement of Disputed Facts appear in the Underlying Lawsuits. However, Superior

2

does dispute the veracity of many of those allegations. Superior also expressly disputes Footnote 2 on page 11 of Plaintiffs' Statement of Undisputed Facts. In that Footnote, Plaintiffs allege that the exception to the exception to the pollution exclusion in the Ohio Casualty policy applies because "at the time of the Release, Superior was performing operations to respond to the September Leak." For reasons set forth below, that "Undisputed Fact" is not true.

## SUPERIOR'S STATEMENT OF UNDISPUTED FACTS

Superior also provides its own Statement of Undisputed Facts as follows:

1.      Superior did not employee Chris Covey; instead, Superior engaged Mr. Covey as an independent contractor to direct an excavation crew employed by L.E. Bell, which Colonial Pipeline Company ("Colonial") had engaged to perform excavation work to expose part of one of its pipelines. (Affidavit of Patrick Dover ("Doc. 67"), ¶ 3) While the Underlying Lawsuits refer to Mr. Covey as Superior's "agent/servant/employee," Mr. Covey was never employed by Superior.

2.      Chris Covey is not now, and was not at the relevant time, an engineer, architect or surveyor. (Doc. 67, ¶ 4) There are no allegations in any of the Underlying Lawsuits to the contrary.

3.      Chris Covey was not performing work on behalf of Superior in the capacity of an engineer, architect or surveyor. (Doc. 67, ¶¶ 4 & 5) There are no allegations in any of the Underlying Lawsuits to the contrary.

4.      Ohio Security issued a commercial general liability insurance policy bearing policy number BKS(17)56089339, for the policy period from July 5, 2016 to July 5, 2017, to Superior ("Ohio Security Policy"). (Doc. 1-9, p. 47).

5.      According to the Ohio Security Policy, an "insured" includes the Named Insured shown in the Declarations and, because the Named Insured is a limited liability company, members and managers of the company also are "insureds," but only with respect to the conduct of the Named Insured's business." (Doc. 1-9, p. 70)

6.      The "Named Insured" listed in the Declarations is "Superior Land Designs, LLC." (Doc. 1-9, p. 60) The term "Named Insured" is not otherwise defined in the Ohio Security Policy. (Doc. 1-9)

7.      According to the Ohio Security Policy, the term "you" is defined as the "Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." (Doc. 1-9, p. 61)

8.      The term "you" is not defined to include independent contractors working on behalf of the Named Insured. (Doc. 1-9, p. 61)

9.      Ohio Casualty issued a commercial umbrella insurance policy bearing policy number USO(17)56089339, for the policy period from July 5, 2016 to July 5, 2017, to Superior ("Ohio Casualty Policy"). (Doc. 1-10, p. 29).

4

10.    According to the Ohio Casualty Policy, the term "Insured" is defined to include the "Named Insured" listed in the Declarations and other organizations not pertinent here. (Doc. 1-10, p. 38)

11.    The "Named Insured" listed in the Declarations of the Ohio Casualty Policy is "Superior Land Designs." (Doc. 1-10, p. 29) The term "Named Insured" is not otherwise defined in the Ohio Casualty Policy. (Doc. 1-10)

12.    The Ohio Casualty Policy defines the term "you" to "refer to the Named Insured as defined in the Insuring Agreement, V. Definitions. (Doc. 1-10, p. 33)

13.    The term "Named Insured" is not defined in the Insuring Agreement, V. Definitions. (Doc. 1-10, p. 38). Instead, as set forth above, the term "Insured" is defined to include the "Named Insured" as listed in the Declarations. (Doc. -10, p. 38)

14.    As amended the pollution exclusion in the Ohio Casualty Policy reads in pertinent part as follows:

This insurance does not apply to:

L. 1.   "Bodily injury", "property damage", "personal injury", "advertising injury" or "personal and advertising injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

…

Paragraph 1. of this exclusion L. does not apply to the following:

(2)    "Bodily injury" or "property damage" arising out of the heat, smoke or fumes from a "hostile fire."

(3)    With respect to any premises, site or location which is or was at any time owned or occupied by or rented or loaned to any "Insured":

…

    (b)    "Bodily injury or "property damage" for which you may be held liable if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional "Insured" with respect to your ongoing operations performed for that additional "Insured" at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any "Insured", other than that additional "Insured."

(4)    "Bodily injury" or "property damage" arising out of the discharge, dispersal, seepage, migration, release or escape of "pollutants" at or from any premises, site or location on which any "Insured" or any contractors or subcontractors working directly or indirectly on any "Insured's" behalf are performing operations if the "pollutants" are not brought on or to the premises, site of location in connection with such operations by such "Insured", contractor or subcontractor.

…

However, the exceptions to this exclusion L. in paragraphs …(2), (3), (4) … above apply only to the extent that insurance is afforded for such "bodily injury" or "property damage" by "underlying insurance". Provided, however, that the coverage afforded by this policy will be no broader than the coverage afforded by such "underlying insurance":

Regardless of the extent of "underlying insurance", none of the exceptions to this exclusion L. in paragraphs …(2), (3), (4) … above apply with respect to "bodily injury" or "property damage" arising out

6

of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape or (sic) "pollutants":

…

(iii)    At or from any premises, site or location on which any "Insured" or any contractors or subcontractors working directly or indirectly on any "Insured's" behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(Doc. 1-10, p. 70)

15.    Colonial was named as an additional "Insured" on both the Ohio Security Policy and the Ohio Casualty Policy. (Doc. 67, ¶ 6, Ex. A)

16.    At the time of the accident, Superior was not performing operations to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants." (Doc. 67, ¶ 7; Ex. A to Plaintiffs' Motion for Summary Judgment, Doc. 66, p. 6)

17.    Instead, Superior was directing L.E. Bell's excavation crew in "excavation being performed … to expose a series of TOR fittings on Line 1 in preparation for upcoming maintenance work to inject nitrogen in to Line 1 during the removal of a temporary bypass pipe used to repair a previous leak." (Doc. 66, p. 6)

18.    "The previous leak on Line 1 occurred September 9, 2016, at a location about 5.5 miles downstream (northeast) of the accident site." (Doc. 66, p. 6)

19.   The excavation work being performed by the L.E. Bell crew "would also permit the installation of additional TORs for nitrogen injection if they were deemed necessary." (Doc. 66, p. 6)

## STANDARD OF REVIEW

Summary judgment is proper only when the evidence shows that "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 123, 1264 (11th Cir. 2010). Furthermore, "[t]he court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor." *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). "If, so viewed, reasonable jurors could find a verdict for the nonmoving party under the substantive evidentiary standard, the nonmoving party can defeat summary judgment. *Id.* at 1383.

## ARGUMENT AND CITATION TO AUTHORITIES

I.     **The Duty to Defend is Broader Than the Duty to Indemnify.**

In Georgia, an insurer's duty to defend is broader than its duty to indemnify. *Shafe v. Am. States Ins. Co.*, 288 Ga. App. 315 (2007). To determine whether Plaintiffs have a duty to defend, this Court "must examine the allegations of the complaint in conjunction with the relevant policy language 'to determine whether a liability covered by the policy is <u>asserted</u>.'" *Allstate Ins. Co. v. Airport Mini Mall,*

8

*LLC*, 265 F. Supp. 3d 1356, 1366 (N.D. Ga. 2017) (quoting *Penn–Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 224 Ga. App. 557, (1997), *aff'd*, 268 Ga. 564 (1997)) (emphasis in original). The duty to defend is excused only when a complaint "unambiguously exclude[s] coverage under the policy, and thus, the duty to defend exists if the claim *potentially* comes within the policy." *Penn-Am Ins.*, 224 Ga. App. at 565-565 (emphasis added). "Where the claim is one of potential coverage, doubt as to liability and the insurer's duty to defend should be resolved in favor of the insured." *Id.* "This principle is especially true with respect to exclusions from coverage sought to be invoked by the insurer." *Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc.*, 651 F.Supp.2d 1367, 1376 (N.D. Ga. 2009).

Moreover, "[e]ven if some of the allegations ultimately are not found to be covered by the policy, the insurer still has a duty to defend the entire action if any of the claims might be." *Travelers Property Cas. Co. of America v. Kansas City Landsmen, L.L.C.*, 592 Fed. Appx. 876, 882 (11th Cir. 2015). Therefore, "where an insurer has a duty to defend a single claim the complaint presents, it has a duty to defend all the claims asserted." *HDI-Gerling Am. Ins. Co. v. Morrison Homes, Inc.*, 701 F.3d 662, 666 (11th Cir. 2012).

## II.    Plaintiffs' Exclusions Should be Construed Narrowly.

Plaintiffs attempt to avoid their duty to defend Superior by invoking two exclusions to coverage in their policies. In Georgia, "exclusions to coverage must be

narrowly and strictly construed against the insurer and liberally construed in favor of the insured to afford coverage." *Nationwide Mut. Fire Ins. Co. v. Erwin*, 240 Ga. App. 816, 816 (1999). "A contract of insurance is construed most strongly against the insurer and liberally in favor of the insured, particularly where the insurer seeks to deny coverage based upon a policy exclusion." *Georgia Farm Bureau Mut. Ins. Co. v. Meyers*, 249 Ga. App. 322, 324 (2001).

### III. Plaintiffs May Not Avoid Their Duty to Defend by Relying on the Professional Services Exclusions.

There are at least two reasons why the "professional services" exclusions in the Plaintiffs' policies do not apply. First, and most obviously, those exclusions by their titles and terms only apply to professional services being performed either by Superior itself or by an engineer, architect, or surveyor working on behalf of Superior. Chris Covey, the independent contractor engaged by Superior to work at the CR-21 accident site was not an engineer, architect, or surveyor. Second, and relatedly, the services being performed by Mr. Covey at the time of the accident are not included in the exclusions' definitions of "professional services."

### A. Chris Covey is not an engineer, architect, or surveyor.

The "professional services" exclusion in the Ohio Security Policy is titled "EXCLUSION—ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSOINAL LIABIILITY." (Doc. 1-9, p. 82) The corresponding exclusion in the Ohio Casualty Policy is titled "ENGINEERS, ARCHITECTS OR

SURVEYORS PROFESSIONAL LIABILITY EXCLUSION." (Doc. 1-9, p. 53) As their names suggest, both exclusions bar coverage for bodily injury and property damage "arising out of the rendering or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity." (Doc. 1-9, p. 82; Doc. 1-10, p. 53 (emphasis added))

The policies both define the term "you" to refer just to the Named Insured and to other organizations not relevant here. Neither policy defines the term "Named Insured," except by reference to the Declarations pages of the policies, both of which list the "Named Insured" only as Superior. It is possible that the term "Named Insured," and therefore the term "you," could be read to include employees of Superior, but those terms certainly do not include independent contractors.[1] *See, e.g., Nationwide Mut. Ins. Co. v. Bader & Assocs., Inc.*, No. 2:13-CV-00032-RWS, 2014 WL 231980, at \*5 (N.D. Ga. Jan. 22, 2014) (holding that while an employee may be included as an insured under a policy, an independent contractor will not be).

---

[1] Indeed, as used in these exclusions, the term "you" may not even include Superior's employees, since those employees are included after the term "you" to refer to those performing work on Superior's behalf. But it does not matter. Chris Covey was not an employee and therefore is not included in even the broadest interpretation of the term "you."

Because Chris Covey was an independent contractor engaged by Superior, and not an employee of Superior, the term "you" cannot include him.[2] (Doc. 67, ¶ 3)

Instead, Mr. Covey was "performing work on [Superior's] behalf" at the time of the accident. Therefore, in order for the professional services exclusions to apply, Mr. Covey would have had to have been an engineer, architect, or surveyor and performing the work in that capacity. But Mr. Covey has never been an engineer, architect, or surveyor. (Doc. 67, ¶ 4) He has no training, credentials or experience in any of those occupations. (Doc. 67, ¶ 4) He was not engaged by Superior to perform any of those roles and certainly was not working in any of those capacities at the time of the accident. (Doc. 67, ¶¶ 4 & 5) And, there are no allegations in any of the Underlying Lawsuits to the contrary.

Because Mr. Covey is not included in the definition of the term "you" and is not an engineer, architect or surveyor, the "professional services" exclusions in the Plaintiffs' policies cannot apply to bar coverage.

B.   Chris Covey was not performing "professional services."

Neither the Ohio Security Policy nor the Ohio Casualty Policy defines the term "professional services." (Doc. 9-9, p. 82; Doc. 9-10, p. 53) Instead, both policies list

---

[2] At a minimum, the policies' failure to define the terms "you," "insured," and "Named Insured" to include independent contractors creates an ambiguity that must be construed against the Plaintiffs and in favor of coverage. *St. Paul Mercury Ins. Co. v. F.D.I.C.*, 774 F.3d 702, 709 (11th Cir. 2014). That is especially true here, where the application of an exclusion depends on the construction of the ambiguity. *Erwin*, 240 Ga. App. at 816.

certain services included in the exclusions. (Doc. 9-9, p. 82; Doc. 9-10, p. 53) According to the policies, those services include "[s]upervisory, inspection, architectural or engineering activities." (Doc. 9-9, p. 82; Doc. 9-10, p. 53) Plaintiffs take the position that because the Underlying Lawsuits allege that Mr. Covey was a third-party inspector responsible for the oversight of the L.E. Bell crew, the "professional services" exclusion bars coverage for his supervision and inspection activities.

Again, the titles of the exclusions imply that they pertain only to services performed by engineers, architects and surveyors. Because the term "professional services" is not defined, a fair reading of these exclusions is that supervisory or inspection services would be excluded from coverage only if these services related to those occupations. In other words, if the Underlying Lawsuits alleged that Superior's liability arose from Mr. Covey's supervision or inspection of work done by an engineer, surveyor or architect, those exclusions may apply. But they cannot apply to any and all supervision or inspection services performed by Superior. If they did, virtually every activity performed by Superior and its employees would be excluded from coverage under the policies. Afterall, the Ohio Security Policy describes Superior's business as "INSPECTING PIPELINES." (Doc. 1-9, p. 47) If Plaintiffs have their way, they would be free to issue insurance policies to an "inspector" and then exclude all inspection activities. Such a reading is

impermissible because it would render the coverage provided under the policies illusory and violate Georgia's public policy. *See, e.g., Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 304 Ga. App. 314, 319 (2010) ("It would violate the public policy of Georgia to allow National Union to sell a liability policy to cover AGL whose main product is natural gas, which policy contains an exclusion for damages resulting from such natural gas.").

According to those Lawsuits, Mr. Covey was, at most, assigned "to inspect and direct the site of the L.E. Bell Crew's excavations occurring on October 31, 2016." (Doc. 66, p. 5) He was not assigned to perform any engineering, architectural or surveying services and, in fact, was not capable of performing any such services. (Doc. 67, ¶ 5) And, he was not assigned to supervise or inspect the performance of any such services. (Doc. 67, ¶ 5) This is yet another reason why the "professional services" exclusions cannot apply.

The cases cited by Plaintiffs do not require a different result. In both *Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co.*, 297 Ga. App. 751 (2009) and *Batson-Cook Co. v. Aetna Ins. Co.*, 200 Ga. App. 571 (1991), the insureds were construction managers, not third-party inspectors. Most importantly, neither of the "professional services" exclusions in those cases required the person performing the services to be an engineer, architect, or surveyor. And neither was limited, by its terms or title, to services performed by engineers, architects, and surveyors. Instead,

14

each of the exclusions was applied to bar coverage for a claim arising out of the construction manager's supervision of a project, supervision that was expressly included as a barred "professional service." Here, of course, the issue is not whether supervision and inspection are included as "professional services"; they clearly are. In order for the specific exclusions in this case to apply, however, Mr. Covey must actually have been an engineer, architect, or surveyor (which he was not) and must have supervised and inspected engineering, architectural or surveying activities (which he did not). Because the exclusions in *Auto-Owners and Batson-Cook* include no such qualification, those cases are inapposite.

For these reasons, the "professional services" exclusions in this case do not apply to bar coverage. At a minimum, they cannot be invoked by Plaintiffs to avoid their much broader duty to defend.

### IV.   Plaintiffs May Not Avoid Their Duty to Defend by Relying on the Pollution Exclusions.

Plaintiffs also seek to shirk their duty to defend by relying on the pollution exclusions in their policies. Plaintiffs do not assert that the explosion—the event that actually caused the bodily injury and property damage at issue in the Underlying Lawsuits—was itself a pollution event. Instead, they contend that there is no coverage for that explosion because it occurred at a site where Superior was "performing operations to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, 'pollutants.'" (Doc.

66, p. 20). The "pollutant" to which Superior was responding, according to Plaintiffs, is gasoline that leaked from a Colonial pipeline five and a half miles from the site of the explosion. (Doc. 66, p. 6)

According to both pollution exclusions, coverage is barred only if bodily injury and property damage <u>arose out</u> of the release of a pollutant <u>at the location where</u> Superior was performing work <u>to respond to pollution</u>. (Doc. 1-9, pp. 63-64; 1-10, p. 70) Plaintiffs argue that this exception to the exception applies because the injury and damage arose out of the September 2016 Leak and Superior was working at the time to respond to that Leak. (Doc. 66, p. 24)

There are at least three reasons why this argument fails. First, and most obviously, Superior was not performing work at the site of the September 2016 Leak; it was working more than five and a half miles from that Leak at the time of the accident. Second, Superior was not actually performing work to respond to the September 2016 Leak. Third, the explosion did not "arise out of" the September 2016 Leak.

A.   <u>Superior was not working at the site of the 2016 Leak at the time of the explosion.</u>

The pollution exclusion will not apply unless the injury and damage arose out of an "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of" a pollutant that occurred at the premises where Superior was performing work to respond to pollution. (Doc. 1-9, pp. 63-64; Doc. 1-10, p. 70)

Plaintiffs contend that the explosion arose out of the discharge of gasoline in the September 2016 Leak. The September 2016 Leak occurred five and a half miles from where Superior was working at the time. So, even if the damages and injuries arose from the 2016 Leak (they did not) and even if Superior was responding to this Leak at the time of the accident (it was not), the exclusion still would not apply. That is because Superior was not working at the location of the 2016 Leak at the time of the accident; it was working five and a half miles away.

This exception may allow Plaintiffs to rely on the pollution exclusion if Plaintiffs were arguing that the explosion itself was the "discharge, dispersal, seepage, migration, release or escape of" the pollution because that explosion occurred where Superior was working. But Plaintiffs know that this argument would fail because an explosion like the one at issue here is not a pollution event. *See, e.g., Racetrac Petroleum, Inc. v. Ace Am. Ins. Co.,* 841 F. Supp. 2d 1286, 1298 (N.D. Ga.) Indeed, the Ohio Casualty Policy actually goes so far as to carve out "hostile fires" from the pollution exclusion. That Policy defines a "hostile fire" as "one which becomes uncontrollable or breaks out from where it was intended to be." (Doc. 1-10, p. 71) There can be no serious dispute that the explosion and fire that resulted in the bodily injury and property damage at issue here constitutes a hostile fire and otherwise is not barred by the pollution exclusions. So, Plaintiffs are left to argue that the explosion arose out of the September 2016 Leak since that Leak could be

characterized as a "discharge, dispersal, seepage, migration, release or escape of" the pollution. Again, though, that Leak did not occur at the site where Superior was performing operations at the time of the explosion, so even if those operations were being conducted to respond to the Leak, the pollution exclusion still would not apply.

As Plaintiffs concede, no Georgia court has ever considered this issue. That is probably because no insurer has ever attempted to rely on a pollution exclusion to bar coverage for an occurrence that took place miles away from the pollution event. In fact, the only case upon which Plaintiffs rely, one from Connecticut, is inapposite because the property damage occurred at the site of the pollution event. *ACSTAR Ins. Co. v. Clean Harbors, Inc.*, 783 F. Supp. 2d 312 (D. Conn. 2011). Here, because the injury and damage occurred away from the site of the pollution event, the exclusion does not apply.

B.   <u>Superior was not responding to the September 2016 Leak at the time of the accident.</u>

Another reason the pollution exclusions cannot apply is because, at the time of the accident, Superior was not performing operations to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants. (Doc. 67, ¶ 7; Declaration of Juan Cazares ("Doc. 68"), ¶¶ 4 & 5; Doc. 66, Ex. A, p. 6) Instead, Superior was inspecting an excavation project to remove a temporary bypass line as part of a multi-phased project. (Doc. 68, ¶ 4) The excavation was necessary so that nitrogen could be injected into one of

Colonial's pipelines. (Doc. 68, ¶ 4) Before the nitrogen was injected, the pipelines had to be exposed and Superior had to inspect the Thread-O-Ring ("TOR") fittings on the pipeline. (Doc. 68, ¶¶ 4 and 5) The excavation work being performed by the L.E. Bell crew "would also permit the installation of additional TORs for nitrogen injection if they were deemed necessary." (Doc. 66, p. 6)

Plaintiffs argue that this excavation project was being performed to respond to the 2016 Leak. (Doc. 66 at 22) But that Leak already had been repaired by the time Superior was inspecting the L.E. Bell excavation work, and there were no pollutants of any kind in the vicinity of that work. (Doc. 68, ¶ 6)

Interestingly, the court in *ACSTAR* distinguished another case that is more closely on point with this one. In that case, *Oscar W. Larson Co. v. United Capitol Ins. Co.*, 64 F.3d 1010 (6th Cir. 1995), a gas station owner installed containment systems on its underground tanks to create a safe gasoline delivery system. The owner contracted with a subcontractor to install some of these systems. *Id.* at 1010. That contractor was "not in the environmental clean-up business per se, and did not engage in any work to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize any *existing* pollution discharge or problem while working for the" gas station owner. *Id.* at 1011 (emphasis in original) Ultimately, the subcontractor got sued for negligence in the installation of the system and requested a defense from its insurance carrier. *Id.* at 1012. The insurer refused to defend the subcontractor,

19

relying on a pollution exclusion substantively similar to the one at issue here. *Id.* The

court rejected the insurer's arguments that the exclusion applied. *Id.* According to

the court:

> Clearly, if [the subcontractor] went to the [gas] stations to work on
> pollutants already in the soil, the exclusion would prevent coverage for
> damages from [the subcontractor's] failure to remedy the situation, or
> for making it worse. However, when read in the context of the other
> phrases surrounding it, we conclude that the phrase "contain ...
> pollution" does not cover installing a [containment system] on a non-
> polluting (at the time) system.

*Id.* at 1014.

This holding applies here. If Superior was working to contain or respond to

pollutants already in the soil at the time of the explosion, the pollution exclusion

may apply.[3] However, Superior, like the subcontractor in *Larson*, is not in the

environmental clean-up business and was merely inspecting TORs in connection

with a project to inject nitrogen into gas lines. Like the system in *Larson*, those gas

lines were non-polluting at the time. Inspecting TORs on non-polluting gas lines

obviously is not the same as containing or responding to pollutants.

Plaintiffs apparently contend that this project was being completed in

response to the September 2016 Leak. At most, the excavation project was being

performed to remove a temporary bypass line that was installed prior to repairing

---

[3] Although the exclusion still would not apply for the reasons set forth above and below.

the 2016 Leak. Even then, though, L.E. Bell, and not Superior, was responsible for removing that bypass line. Plus, by the time the line was removed, the Leak had been resolved and there was nothing else left to respond to. And, finally, the project also involved the installation of other TORs for additional nitrogen injection that apparently had nothing whatsoever to do with the September 2016 Leak.[4]

For these reasons, Superior was not responding to the September 2016 Leak at the time of the accident and the pollution exclusions therefore do not apply.

C.   The bodily injury and property damage did not arise out of the September 2016 Leak.

For the same reasons, and others, Plaintiffs are wrong that the bodily injury and property damage allegedly caused by the explosion and fire "arose out" of the September 2016 Leak.

In the first place, Plaintiffs are entirely incorrect about the standard used by Georgia courts to determine whether a claim "arose out" of an event in the context of a policy exclusion. Plaintiffs cite to *JNJ Found. Specialists, Inc. v. D.R. Horton*,

---

[4] None of these facts is inconsistent with the allegations in the Underlying Lawsuits. But, even if they were, Plaintiffs still would have a duty to defend. That is because an insurer has a duty to defend "even when the complaint against the insured falsely indicates non-coverage.... In that rare class of cases, courts should look to whether the true facts showing coverage are known or ascertainable to the insurer." *Illinois Union Ins. Co. v. William C. Meredith Co.*, No. 1:07-CV-1840-WBH, 2008 WL 11334594, at *5 (N.D. Ga. Sept. 29, 2008) "If the true facts are known or ascertainable to the insurer at the outset, then the insurer is obligated to defend the suit, just as if the complaint against the insured falsely alleged coverage." *Id.* Here, Plaintiffs knew these facts, even if they were not alleged in the Underlying Lawsuits, because they were included in the NTSB Report that Plaintiffs attached to their own Motion for Summary Judgment. (Doc. 65)

*Inc.*, 311 Ga. App. 269 (2011) for the proposition that when it comes to the phrase "arising out of," "[a]lmost any causal connection or relationship will do." (Doc. 66, p. 23) But, *D.R. Horton* did not involve a policy exclusion; instead it focused on the phrase "arising out of" in the context of other indemnity provisions. *D.R. Horton*, 311 Ga. App. at 270. Georgia courts have recognized a very important distinction between the interpretation and application of the phrase "arising out of" in an indemnity provision and the same phrase in a policy exclusion. *See, e.g., Earwood v. Evanston Ins. Co.*, 234 F. Supp. 3d 1278 (N.D. Ga. 2017); *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 304 Ga. App. 314 (2010).

In *Earwood*, a woman drowned after she dove into the water and the yacht that she had been on backed over her. 234 F. Supp. 3d at 1280. When the woman's husband sued the yacht operator, the operator's insurer sought to avoid its duty to defend by invoking its in-water activity exclusion. *Id.* at 1281. That exclusion barred coverage for injuries "caused by or resulting from any in water activities such as, but not limited to, swimming, diving, and waterskiing." *Id.* at 1281. The court agreed that the woman had been participating in the kind of in-water activity described in the exclusion but held that her death had not "arisen from" that activity.[5] The court

---

[5] The parties agreed that the "'caused by or resulting from' language equates to 'arising out of,' which itself means that the in water activity must have been the 'but for' cause of the injury." *Id.* at 1283. So, the court looked to the case law regarding the "arising out of" language in order to reach its holding.

acknowledged that courts construe broadly the "arising out of" language when found in coverage provisions. *Id.* at 1284. "By contrast, however, when found in an exclusionary clause of an insurance policy, 'but for' cause becomes the 'test traditionally used to determine cause-in-fact for tort claims.'" *Id.* at 1284 (citing *Continental Cas. Co. v. H.S.I. Financial Svcs.*, 266 Ga. 260, 262 (1996)). According to the court:

> It's true that in one sense Christine's injuries would not have occurred "but for" her being in the water. It's true in that same sense, however, that she would be alive today "but for" deciding to go the lake that day. That kind of "but for" causation is not the kind relevant to the cause inquiry conducted in the exclusionary clause context.

*Id.* at 1285.

Perhaps *Barrett* is even more on point. In that case, an employee of a company that installs gas pipelines was assisting employees of Atlanta Gas Light ("AGL") on a project. 304 Ga. App. at 315. During that project, he was exposed to natural gas for a prolonged period of time and suffered brain damage. *Id.* at 316. When he sued AGL for the negligence of its employees, that company's insurer relied on its pollution exclusion to deny coverage, arguing that the claimant's injuries arose out of his exposure to natural gas which was considered a pollutant under the policy. *Id.* at 318.

The court rejected this argument. *Id.* at 321-322. According to the court, because he could have worked in the presence of natural gas without sustaining any

injury, the gas was not the "but for" cause of his injury. *Id.* Instead, according to the allegations in the complaint, his injuries were caused by the negligence of the AGL employees, who allowed the claimant to remain exposed to the natural gas for a long period of time without monitoring the oxygen levels. *Id.* The court held that the pollution exclusion therefore did not apply.

The same is true here. Even if Superior had been responding to the September 2016 Leak at the time of the accident, there is nothing to suggest that the Leak is what caused the bodily injury and property damage alleged in the Underlying Lawsuits. According to those Lawsuits, the injury and damage were caused by an L.E. Bell track hoe operator digging in the wrong place and striking a pipeline at a vulnerable location. Certainly, Superior could have responded to the September 2016 Leak without that happening, just as the woman in *Earwood* could have participated in the in-water activity without drowning were it not for the negligence of the yacht operator, and just as the claimant in *Barrett* could have been exposed to natural gas without suffering a brain injury were it not for the negligence of the AGL employees.

For these reasons, the bodily injury and property damage alleged in the Underlying Lawsuits did not arise from the September 2016 Leak. This is yet another reason why the pollution exclusions should not apply to relieve Plaintiffs of their duty to defend.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be denied and this Court should find that Plaintiffs have an ongoing duty to defend Superior in connection with the Underlying Lawsuits.

**Dated: September 18, 2020**          */s/ Adam Plant*
Harlan F. Winn III
Adam P. Plant
**BATTLE & WINN LLP**
2901 2nd Ave. South, Suite 220
Birmingham, AL 35233
T: 205-397-8160
F: 205-397-8179
E:   *hwinn@battlewinn.com*
     *aplant@battlewinn.com*

Jonathan M. Palmer
(Admitted *pro hac vice*)
Georgia Bar No. 453452
**KNIGHT PALMER, LLC**
One Midtown Plaza
1360 Peachtree Street NE
Suite 1201
Atlanta, GA 30309
O: 404.228.4822
D: 404.719.4039
E: *jpalmer@knightpalmerlaw.com*

***Counsel for Superior Land Designs, LLC***

## <ins>CERTIFICATE OF SERVICE</ins>

I electronically filed this document with the Clerk of Court using the CM/ECF system on September 18, 2020, which will send notification of this filing to all counsel of record registered under the CM/ECF system to receive such notices.

*s/ Adam Plant*_____
OF COUNSEL

26