FILED

2020 Sep-18  PM 05:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **OHIO SECURITY INSURANCE** ) | |
| **CO. and OHIO CASUALTY** ) | |
| **INSURANCE CO.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | **2:19-CV-1656-MHH** |
| **SUPERIOR LAND DESIGNS, LLC,** ) | |
| **COLONIAL PIPELINE CO.,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |

**COLONIAL PIPELINE COMPANY'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON**
**THE DUTY TO DEFEND AND MEMORANDUM OF LAW IN SUPPORT**

Colonial Pipeline Company ("Colonial"), by counsel, responds to Ohio

Security Insurance Company and Ohio Casualty Insurance Company's (together,

the "Insurers") Motion for Summary Judgment on the Duty to Defend ("Motion")

(Doc. 66), as follows[1]:

**INTRODUCTION**

This declaratory judgment action arises out of the Insurers' attempt to avoid

providing their insured, Superior, a defense or indemnity for lawsuits filed against

---

[1] Although the Court requested briefing from the Insurers and Superior Land Designs, LLC
("Superior"), Colonial files this Opposition because, as an additional insured under Superior's
policies, it also has a significant interest in securing coverage for the claims against it and
Superior.

Superior.  No one disputes that the policies are triggered.  Rather, the Insurers claim that two policy exclusions preclude coverage: (1) the engineers, architects or surveyors professional liability exclusion, and (2) the pollution exclusion.  Neither exclusion applies here.

The engineers, architects or surveyors professional liability exclusions do not apply because an engineer, architect or surveyor did not perform, or fail to perform, the alleged acts giving rise to Superior's alleged liability.  It does not matter whether those acts were "professional" in nature.  The exclusion only applies if one or more of three types of professionals perform the professional acts: engineers, architects and surveyors.  Superior's contractor was none of these, so the exclusions do not apply.

The pollution exclusion does not apply because a pollutant did not cause the alleged bodily injuries and property damage of the plaintiffs asserting the underlying claims against Superior.  But, even if it had, because Superior was not involved in environmental cleanup at the time, then under one of the policies, the exclusion would not apply, and under the other policy, the claim falls within an exception to the pollution exclusion.  In both circumstances, the exclusion does not preclude coverage.

The Insurers have not and cannot meet their burden of proving these exclusions allow them to avoid their defense and indemnity obligations to

Superior.  Colonial, as an interested party by virtue of its additional insured status, therefore asks the Court to deny the Motion.

## STATEMENT OF FACTS

Colonial owns and operates a refined petroleum pipeline system (the "Pipeline").  (Doc. 1-3, ¶ 6; Doc. 1-4, ¶ 11; Doc. 1-5, ¶ 12; Doc. 1-6, ¶ 5; Doc. 1-7, ¶ 17).  Superior is a contractor that was performing work for Colonial on October 31, 2016.  (Doc. 1-3, ¶ 21; Doc. 1-4, ¶ 25; Doc. 1-5, ¶ 19; Doc. 1-6, ¶ 19; Doc. 1-7, ¶¶ 20-21).  The Insurers issued two insurance policies to Superior that were in effect on October 31, 2016: a commercial general liability policy (the "CGL Policy") (Doc. 1-9), and a commercial umbrella policy (the "Umbrella Policy") (Doc. 1-10).  Colonial is an additional insured on the Policies.  (Doc. 67, ¶ 6).  Superior made a claim for liability coverage under the Policies for bodily injuries and property damage that occurred on October 31, 2016.

### A.    The September 2016 Incident

On or about September 9, 2016, Colonial discovered a release of gasoline from its Line 1 in Shelby County, Alabama.  (Doc. 1-3, ¶ 10; Doc. 1-4, ¶ 15; Doc. 1-5, ¶ 16; Doc. 1-6, ¶ 9; Doc. 1, ¶ 29, Doc. 33, ¶ 29) (the "September 2016 Incident").  Colonial contracted with L.E. Bell Construction, Inc. ("L.E. Bell") to perform excavation and repairs of the Pipeline at the site of the September 2016

Incident.  (Doc. 1-3, ¶ 15; Doc. 1-4, ¶ 21; Doc. 1-5, ¶ 13; Doc. 1-6, ¶ 14; Doc. 1-7, ¶ 18; Doc. 1, ¶ 30, Doc. 33, ¶ 30).

### B.    The October 2016 Incident

Colonial also engaged L.E. Bell to work on other Pipeline projects.  (Doc. 1-3, ¶ 16; Doc. 1-4, ¶ 22; Doc. 1-5, ¶ 13; Doc. 1-6, ¶ 14; Doc. 1, ¶ 30, Doc. 33, ¶ 30; Doc. 69, ¶ 4).  Among those projects was the removal of a temporary bypass. (Doc. 69, ¶¶ 3-4).  The bypass was installed so that Colonial could continue to operate Line 1 after the September 2016 incident and to allow contractors to conduct excavation, repair and response work related to the September 2016 Incident.  Part of the bypass removal project involved injecting nitrogen into the pipeline.  (Doc. 65, p. 6; Doc. 69, ¶ 4).  To prepare for the nitrogen displacement, it was necessary to excavate the pipeline and inspect a series of Thread-O-Ring ("TOR") fittings on the pipeline.  (Doc. 65, p. 6; Doc. 69, ¶ 4).

Colonial retained Superior to serve as a third-party inspector for the TOR work performed on October 31, 2016.  (Doc. 65, p. 6; Doc. 69, ¶ 5).  Superior in turn hired Christopher Covey, an independent contractor, to perform that work. (Doc. 67, ¶ 3; Doc. 1-3, ¶ 26; Doc. 1-4, ¶ 29; Doc. 1-5, ¶ 23; Doc. 1-6, ¶ 23). Superior's work that day did not involve any environmental cleanup or other response to pollutants or environmental contaminants at the site.  (Doc. 67, ¶ 7; Doc. 69, ¶¶ 5-6).

4

During the course of the excavation work, L.E. Bell workers struck the Pipeline, resulting in a rupture of Line 1.  (Doc. 1-3, ¶ 41; Doc. 1-4, ¶ 42; Doc. 1-5, ¶¶ 18, 33-34; Doc. 1-6, ¶ 33; Doc. 1-7, ¶ 21).  The gasoline in Line 1 ignited, and an explosion and fire allegedly occurred, causing death, bodily injury, and property damage (the "October 2016 Incident").  (Doc. 1-3, ¶¶ 42-43, 47-48; Doc. 1-4, ¶¶ 43-44; Doc. 1-5, ¶¶ 34, 36; Doc. 1-6, ¶¶ 34-35, 37; Doc. 1-7, ¶ 21).

### C.   The Underlying Lawsuits

Several lawsuits were filed against Colonial and Superior as a consequence of the October 2016 Incident.  (Docs. 1-3, 1-4, 1-5, 1-6, and 1-7).  Superior sought a defense of the Underlying Lawsuits from its Insurers.  (Doc. 1, ¶ 46; Doc. 33, ¶ 46).  The Insurers agreed to provide Superior a defense under a reservation of rights (Doc. 1, ¶ 47; Doc. 33, ¶ 47) and filed this declaratory judgment action.

## ARGUMENT

### I.   Principles and Standards of Review

### A.   Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving

party." *Cobblestone Condo. Ass'n, Inc. v. Travelers Cas. Ins. Co. of Am.*, 377 F. Supp. 3d 1291, 1295 (N.D. Ala. 2019) (citing *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015)).  A litigant's sworn statements based on personal knowledge or observation can defeat summary judgment.  *Id.*

### B.    Principles of Insurance Policy Interpretation

When construing an insurance policy under Georgia law,[2] courts begin with the text of the policy itself.  *Payne v. Twiggs Cty. Sch. Dist.*, 269 Ga. 361, 363(2) (1998).  Where the relevant policy language is clear and unambiguous, "the terms in an insurance policy require no construction, and their plain meaning will be given full effect."  *Id.*

Where, however, an "insurance policy provision is susceptible to more than one meaning, even if each meaning is logical and reasonable, the provision is ambiguous."  *Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 719 (2016).  If there is an ambiguity, "three well-known rules of contract construction that apply: (1) ambiguities are strictly construed against the insurer as the drafter; (2) exclusions from coverage the insurer seeks to invoke are strictly construed; and (3) the contract is to be read in accordance with the reasonable expectations of the insured when possible."  *Auto-Owners Ins. Co. v. Neisler*, 334 Ga. App. 284, 287

---

[2] The parties previously agreed that Georgia law applies. Superior is a Georgia company and the Policies were issued to Superior at its Alpharetta, Georgia headquarters.

(2015).  An insurer's motion for summary judgment must be denied when it is based on an ambiguous exclusion.  *Id.*

This result is in keeping with the shifting burden of proof in establishing a duty to defend.  In Georgia, the insured has the initial burden of proving that a claim is within the policy's coverage grant.  *Ga. Farm Bureau Mut. Ins. Co. v. Hall Cty.*, 262 Ga. App. 810, 812 (2003).  The insurer then has the burden of showing that a loss or claim falls within an exclusion, and accordingly, that it does not have a duty to defend.  *Kay-Lex Co. v. Essex Ins. Co.*, 286 Ga. App. 484, 488-90 (2007).  Since the parties have agreed that the claims against Superior fall within the Policies' coverage, the burden of proof – specifically as to the applicability of the two exclusions – rests entirely upon the Insurers as to this litigation and the Motion.

### C.   The Broad Duty to Defend

An insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that "even arguably bring the occurrence within the policy's coverage.'"  *Landmark Am. Ins. Co. v. Khan*, 307 Ga. App. 609, 612 (2011).  Therefore, a court properly considers the four corners of the agreement and the surrounding circumstances to determine the parties' intent.  *W. Pac. Mut. Ins. Co. v. Davies*, 267 Ga. App. 675, 681 n. 6 (2004).  If an insurer seeks to deny coverage based on a policy exclusion or limitation, the exclusion must

"unambiguously" apply. *Khan*, 307 Ga. App. at 612. Any "doubts as to liability and [the insurer's] duty to defend should be resolved in favor of the insured." *Id.*

If "the complaint on its face shows no coverage, but the insured notifies the insurer of factual contentions that would place the claim within the policy coverage… the insurer has an obligation to give due consideration to its insured's factual contentions and to base its decision on 'true facts.'" *Colonial Oil Indus. Inc. v. Underwriters Subscribing to Policy Nos. TO31504670 & TO31504671*, 268 Ga. 561, 562 (1997). This reflects Georgia court's policy of not allowing "the allegations of a third-party [*e.g.*, the underlying plaintiff] to determine the insured's rights under its contract" applies in this case. *Id.* at 339; *Loftin v. U.S. Fire Ins. Co.*, 106 Ga. App. 287, 296 (1962). ("It would not be reasonable… that the assertions of a third party, a stranger to the contract, rather than the true facts, be allowed to determine the rights between the contracting parties."). This "exception to the 'exclusive pleadings' rule is designed to benefit the insured, not harm it." *Progressive Mountain Ins. Co. v. R.W. Womack & Sons, Inc.*, No. CV 111-159, 2013 WL 12180601, at *5 (S.D. Ga. June 12, 2013).

In support of their Motion, the Insurers introduce a report by the National Transportation Safety Board (the "NTSB Report") (Doc. 65) into the record, asking the Court to take judicial notice of its contents. (Doc. 66, p. 4, n. 1). While the NTSB Report actually does not support the Insurers' position – the opposite, in

fact (*see* Section II.B.2., *infra*) – Georgia's duty to defend standard requires that any inferences the Court draws from it be in favor of coverage.  Similarly, the evidence submitted on behalf of the policyholder here, which alleges facts that place the claim within coverage must be considered, regardless of the allegations of the complaint.  *Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 224 Ga. App. 557, 563 (1997), *aff'd Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 268 Ga. 564 (1997).

## II.     The Policies Require Coverage for the Claims against Superior

The parties do not dispute the Policies' insuring agreements are triggered, but the Insurers seek to evade their duties under the Policies by pointing to two exclusions, neither of which applies.

### A.     The Engineers, Architects or Surveyors Professional Liability Exclusions Do Not Apply

In their haste to jam Superior's claim into the rubric of the engineers, architects or surveyors professional liability exclusion, the Insurers overlook both the exclusions' title and its equally clear text.  The exclusions only apply when "*you[3] or any engineer, architect or surveyor*" perform professional services.  (Doc. 1-9, p. 82; Doc. 1-10, p. 53).  Covey, the independent contractor Superior hired, is none of these things.

---

[3] The Policies define "you" as the Named Insured, which, by reference to the Policies' declarations, is Superior itself. No other person or entity is included within that definition.

### 1.   *Covey is Not an Engineer, Architect or Surveyor*

None of the Underlying Lawsuits alleges that Covey was an engineer, architect or surveyor, because he is not any of those.  (Doc. 67, ¶ 4).  Some of the Underlying Lawsuits refer to Covey as an "inspector," but that is not the same thing as an engineer, architect or surveyor.  If the Insurers had meant the exclusion to apply to inspectors, they could have included that position in the title and text, as they did for the stated professions.

Indeed, the fact that an inspector is not listed with the other professions is determinative, because "[t]he express mention of one thing implies the exclusion of another."  *Krogh v. Pargar, LLC*, 277 Ga. App. 35, 39 (2005) (applying the contractual interpretation principle "*expressio unius est exclusio alterius*").  This is particularly true when the contract includes "an enumerated list of items, but no accompanying catchall provision," as here.  *Montgomery Cty. v. Hamilton*, 337 Ga. App. 500, 508 (2016).  The exclusion does not say "engineers, architects, surveyors, *and other professionals*"; it is limited to three professions, none of which applies to Covey.

### 2.   *Merely providing a "professional service" is not sufficient*

The cases upon which the Insurers rely are inapposite.  None of the decisions involves the same exclusion at issue here.  The policies in those cases contained basic professional services exclusions, not *engineers, architects or*

*surveyors* professional liability exclusions.  *See Auto-Owners Ins. Co. v. Unit Owners Ass'n of Riverview Overlook Condo., Inc.*, No. 1:13-CV-3012-TWT, 2014 WL 5465286, at *1 (N.D. Ga. Oct. 28, 2014) (general contractor's policy excluded damages "due to rendering or failure to render any professional service"); *Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co.*, 297 Ga. App. 751, 753 (2009) (construction manager's policy excluded "'[b]odily injury' or 'property damage' due to rendering or failure to render any professional service"; project manager's policy excluded "bodily injury, property damage or personal injury due to rendering or failure to render any professional services or treatments"); *Batson-Cook Co. v. Aetna Ins. Co.*, 200 Ga. App. 571, 573 (1991) (construction manager's policy excluded "bodily injury or property damage arising out of the rendering of or the failure to render any professional services by or for the named insured").  To summarize, every one of these cited cases involved a broader exclusion than those in the Policies here, namely by excluding coverage for damages arising out of *any* professional service, as opposed to the exclusion at issue here, which is limited to services by engineers, architects, and surveyors.

Not only are the exclusions at issue here narrower than those in the decisions cited by the insurers, but under Georgia law, the exclusions must be interpreted narrowly to begin with.  *Neisler*, 334 Ga. App. at 287.  Here, unlike the policies in cases cited by the Insurers, the professional services exclusion cites only three

11

professions to which it applies: engineers, architects, and surveyors.  Under Georgia law, an insurance company is "free to fix the terms of its policies as it sees fit, so long as they are not contrary to the law, and it may insure against certain risks while excluding others."  *Payne*, 269 Ga. at 363(2) (accord *Sorema N. Am. Reinsurance Co. v. Johnson*, 258 Ga. App. 304, 306 (2002)).  If the Insurers had intended to apply the exclusion to a broader class of professionals or professional acts, they could have used the broader exclusion applied in the above-cited cases. They did not.

The exclusions that the Insurers chose are unambiguous in their limited application.  "By its very specific and limiting language, this caption alerts the insured that the following language pertains to the acts of three named professions."  *Cowell v. Gaston Co.*, 190 N.C. App. 743, 748 (2008) (considering the same engineers, architects or surveyors professional liability exclusion).  *Id.* at 748.  A reasonable insured, guided by the title and the endorsement's text, could interpret the exclusion as applying only to professional engineers, architects or surveyors.  *Id.* at 748.  After all, the listed "professional services," including "inspection," are services performed by engineers, architects and surveyors.  *Id.*

This is precisely how other courts have read the specific language of this exclusion.  *See, e.g., Monroe Guar. Ins. Co. v. TEE Eng'g Co*., No. CIV.A. 04-58-JBC, 2005 WL 1503219, at *2 (E.D. Ky. June 23, 2005).  In *TEE Engineering*, the

court considered the tasks of several different employees of an engineering company who performed services in the context of an underlying action. The court applied an engineers, architects or surveyors professional liability exclusion only to the work of one employee, who was a certified professional engineer. *Id.* at *3.

The narrower professional services exclusion at issue here and the reasoning in *Cowell* and *TEE Engineering* mandate the same result. Superior hired Covey as an independent contractor (Doc. 67, ¶ 3) to perform its work at the October 2016 Incident site. (Doc. 1-3, ¶ 28). Covey was not an engineer, architect or surveyor. (Doc. 67, ¶ 4). So, even if Covey's work fell into the very heart of the "professional services" definition (which it did not (Doc. 67, ¶ 5)), because he is not an engineer, architect or surveyor, the exclusion does not apply.

**B.      The Pollution Exclusions Do Not Apply**

The pollution exclusions do not apply because (1) the bodily injuries and property damage were caused by a fire, not by gasoline as a "pollutant," and (2) Superior was not performing any form of environmental testing or remediation at the October 2016 Incident site. If there remains any doubt that the pollution exclusion clearly does not apply, the Policies harbor an ambiguity that must be resolved in favor of coverage.

*1.*     *The alleged bodily injury and property damage did not arise out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants"*

Both Policies exclude coverage for bodily injury or property damage caused by "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants'." (Doc. 1-9, p. 63; Doc. 1-10, p. 70). These exclusions do not apply, because a pollutant did not cause the underlying plaintiffs' alleged bodily injuries and property damages. The underlying plaintiffs' allege that an explosion and subsequent fire caused their injuries and damages. (Doc. 1-3, ¶ 47; Doc.1-4, ¶¶ 50, 80-81; Doc. 1-5, ¶¶ 39, 49; Doc. 1-6, ¶ 37; Doc. 1-7, ¶ 38).

Merely because a potential pollutant is involved does not mean that the pollutant itself caused the resulting bodily injury or property damage. Context matters, as demonstrated by *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 304 Ga. App. 314 (2010). *Barrett* is on all fours with the current case.

Barrett was an employee of an Atlanta Gas Light ("AGL") contractor hired to perform work on AGL's natural gas pipelines. *Id.* at 328. While the employee was working, natural gas accumulated in his workspace, creating an oxygen-deficient atmosphere, which caused Barrett to suffer a permanent and disabling brain injury. Barrett sued AGL, alleging AGL's negligence caused his injury. *Id.* He obtained a judgment against AGL and then demanded coverage from AGL's

liability insurer (AGL had assigned its rights to Barrett).  *Id*. at 329.  The insurer

denied coverage, citing the pollution exclusion, and Barrett sued.

In reversing the trial court's grant of the insurer's motion to dismiss, the

Georgia Court of Appeals held that the pollution exclusion did not apply.  Barrett

had "not alleged that Barrett was 'poisoned' by natural gas or that he was harmed

merely by the release of natural gas from the tap."  *Id.* at 330.  Instead, he had

alleged that "the natural gas released from the tap was allowed to accumulate,

thereby creating an oxygen-deprived atmosphere, and that it was the lack of

oxygen that injured Barrett."  *Id*.  The mere presence of natural gas, standing alone,

did not trigger the pollution exclusion.  After all, "exposure to natural gas is not

necessarily dangerous and does not automatically result in injury so long as the

supply of oxygen is not impeded."  *Id.*

So too here.  Gasoline is not necessarily dangerous and usually does not

result in injury (otherwise, filling a gas tank would be a hazardous chore).  But if

gasoline is ignited, the resulting fire can cause bodily injury and property damage.

Here, gasoline was released and it ignited.[4] The underlying plaintiffs allege they

were injured by the resulting explosion and fire – not the gasoline itself – and

specifically allege they were harmed by the concussion and flames, not by any

---

[4] The NTSB Report attached to the Insurers' Motion notes power line sparks just prior to ignition
and several internal combustion engines operating at the site.

toxic characteristic of the gasoline itself.  In this context, the pollution exclusion does not apply, because a "pollutant" did not cause the alleged bodily injury and property damage.

The Insurers cite *Truitt Oil & Gas Co. v. Ranger Ins. Co*. as authority that gasoline is a pollutant. 231 Ga. App. 89 (1998).  In *Truitt*, it was.  Gasoline leaked from the insured's underground storage tanks into the ground and sewer system, causing the neighboring garden center to lose the use of its property.  *Id.* at 89. The gasoline directly caused the property loss, because its presence – specifically, the fumes and chemical saturation of property – made the property unusable.  That is not the case here, where the alleged injuries were caused by fire and concussion.

### 2. *Regardless, any such pollution event did not occur during a response to an environmental clean up*

Even if gasoline was a "pollutant" in this context, the exclusions do not apply, because the alleged explosion and fire did not occur during operations to "test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of 'pollutants.'"  *See* Doc. 1-9, p. 64; 1-10, p. 70-71.  In other words, the Insurers have failed to meet their burden to show that condition f.(1)(e) to the CGL Policy's pollution exclusion has been met, or that the

exception L.1.(4)(iii) to the L.1.(4) exception to the Umbrella Policy's pollution exclusion applies.[5]

The Insurers argue that the alleged explosion and fire occurred when Superior was responding to the September 2016 Incident, which occurred 52 days before and 5.5 miles northeast of the October 2016 Incident site.  The NTSB Report that the Insurers attached to their Motion, sworn statements from Superior and Colonial representatives, and logic demonstrate otherwise.

The NTSB Report says, "At the time of the accident, the excavation being performed was to expose a series of TOR fittings on Line 1 *in preparation for upcoming maintenance work* to inject nitrogen into Line 1 during the removal of a temporary bypass pipe used to repair a *previous* leak."  (Doc. 65, p. 6) (emphasis added).  The NTSB Report does not indicate there were any environmental contaminants at the October 2016 Incident site or that environmental remediation was taking place.  Sworn statements from Superior and Colonial's representatives confirm that the scope of the work did not involve remediation.  ("Superior's work did not involve any activities to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of pollutants or any form of environmental contamination."  (Doc. 69, ¶ 5); "At the time of the

---

[5] The Russian-dolled nature of the Umbrella Policy's pollution exclusion's exceptions to exceptions to exclusions alone might merit a finding that the Umbrella Policy is ambiguous. As noted previously , the Insurers bear the burden of proving an exclusion (or exceptions to exceptions to exclusions) apply unambiguously. *Kay-Lex Co.*, 286 Ga. App. at 488-90.

accident, Superior was not performing operations to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of 'pollutants.'"  (Doc. 67, ¶ 7)).  At the very least, the discrepancy between the underlying plaintiffs' allegations and the facts ascertained by an NTSB investigation and a sworn statement from Colonial, the company actually ordering the work on its property and its Pipeline, means that the pollution exclusions do not "unambiguously" apply.  *See BBL–McCarthy, LLC v. Baldwin Paving Co.*, 285 Ga. App. 494, 497 (2007)) (to excuse the duty to defend, lack of coverage must be unambiguous).

The Insurers' reliance on the "catch-all" phrase at the end of the verbal string does not ameliorate the ambiguity.  Georgia courts apply the rule of *ejusdem generis* that:

> [W]hen a statute or document enumerates by name several particular things, and concludes with a general term of enlargement, this latter term is to be construed as being [of the same kind or class] with the things specifically named, unless, of course, there is something to show that a wider sense was intended.

*Cox Commc'ns, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 708 F. Supp. 2d 1322, 1328 (N.D. Ga. 2010) (citing *Dep't of Transp. v. Montgomery Tank Lines, Inc.*, 276 Ga. 105, 107 n. 5 (2003)).  The guiding principle behind ejusdem generis is that if the general "catch-all" words were meant to "be used in their

unrestricted sense," there would be no reason to list words that are more particular first.  *Id*.  (citation omitted).

Applied here, the phrase "or in any way respond to, or assess the effects of 'pollutants'" must be within the class of "test for, monitor, clean up, remove, contain, treat, detoxify or neutralize."  At the October 2016 Incident site, there was no pollutant to "test for, monitor, clean up, remove, contain, treat, detoxify or neutralize."  There was no pollutant to "respond to" or "assess the effects of." Those activities were taking place 5.5 miles away at the September 2016 Incident site.

The work on October 31, 2016 was akin to that performed by the insured in *Oscar W. Larson Co. v. United Capitol Ins. Co*., 64 F.3d 1010 (6th Cir. 1995). There, the insured was installing a secondary pipe around a primary pipe meant to contain leaks.  *Id.* at 1011.  After the installation, the property owner discovered a gasoline leak at the site and sued the installer.  *Id.* at 1012.  The installer's insurer questioned whether the leak from the primary pipe had begun before the installation of the secondary pipe.  *Id.* at 1011.  The court agreed with the insured's assertions that the primary pipe was not leaking at the time of installation, and gasoline had not already contaminated the soil at the site.  *Id.*

Had the insured gone to the jobsite "to work on pollutants already in the soil," the exclusion might apply.  *Id.* at 1014.  But the exclusion did not apply to

the insured's work on a non-polluting system, because "each term in the clause is a verb that presupposes an attempt to remedy an *existing* pollution problem." *Id.* at 1014.

There was no existing pollution at the October 2016 Incident site. (Doc. 69, ¶ 6). Superior was not on the site to "test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of 'pollutants.'" (Doc. 69, ¶ 5; Doc. 67, ¶ 7). As such, the pollution exclusion in the CGL Policy (Doc. 1-9, p. 64, f.(1)(e)) and the exception to the exception to the pollution exclusion in the Umbrella Policy (Doc. 1-10, p. 70-71, L.1.(4)(iii)) do not apply. To the extent there remains any question or ambiguity on this point, the policy should be construed in favor of coverage and the policyholder's reasonable expectations of coverage. *Neisler*, 334 Ga. App. at 287.

## CONCLUSION

As the Insurers have failed to meet their burden of proving either exclusion applies, their Motion should be denied.

This 18th day of September, 2020.  By:  *Alan D. Mathis*
　　　　　　　　　　　　　　　　　　Alan D. Mathis
　　　　　　　　　　　　　　　　　　Alabama State Bar No. ASB-8922-A59M
　　　　　　　　　　　　　　　　　　BUTLER SNOW LLP
　　　　　　　　　　　　　　　　　　1819 Fifth Avenue North, Suite 1000
　　　　　　　　　　　　　　　　　　Birmingham, Alabama  35203
　　　　　　　　　　　　　　　　　　Telephone:  (205) 297-2239
　　　　　　　　　　　　　　　　　　Facsimile:  (205) 297-2201
　　　　　　　　　　　　　　　　　　Email:  Alan.Mathis@ButlerSnow.com

Lawrence J. Bracken II*
Georgia Bar No. 073750
lbracken@huntonAK.com
Laura T. Wagner*
Georgia Bar No. 674911
lwagner@huntonAK.com
Rachel E. Hudgins*
Georgia Bar No. 123342
rhudgins@huntonAK.com
HUNTON ANDREWS KURTH LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, Georgia 30308-2216
Telephone: (404) 888-4183

Michael S. Levine*
District of Columbia Bar No. 449272
mlevine@huntonAK.com
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 955-1500

***Attorneys for Defendant,
Colonial Pipeline Company***

*Admitted *pro hac vice*

21

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that a copy of **COLONIAL PIPELINE COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE DUTY TO DEFEND AND MEMORANDUM OF LAW IN SUPPORT** was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record via the Court's CM/EMF filing system.

John W. Dodson
Michelle L. Crunk
Dodson Gregory, LLP
Post Office Box 530725
Birmingham, Alabama  35253
jwd@dodsongregory.com
mlc@dodsongregory.com
*Attorneys for Ohio Security
Insurance Company and The Ohio
Casualty Insurance Company*

Seth V. Jackson
Zelle LLP
161 Worcester Road
Suite 502
Framingham, Massachusetts
sjackson@zelle.com
*Attorney for Ohio Security
Insurance Company and The Ohio
Casualty Insurance Company*

James V. Chin
Zelle LLP
1201 West Peachtree Street NW
Suite 610
Atlanta, Georgia  30309
jchin@zelle.com
*Attorney for Ohio Security
Insurance Company and The Ohio
Casualty Insurance Company*

Harlan F. Winn, III
Adam P. Plant
Battle & Winn, LLP
2901 2nd Avenue South
Suite 220
Birmingham, Alabama  35233
hwinn@battlewinn.com
aplant@battlewinn.com
*Attorneys for Superior Land
Designs, LLC*

Jonathan M. Palmer
Knight Palmer, LLC
One Midtown Plaza
1360 Peachtree Street NW
Suite 1201
Atlanta, Georgia  30309
jpalmer@knightpalmerlaw.com
*Attorneys for Superior Land*
*Designs, LLC*

Lloyd W. Gathings
Gathings Law
2140 11th Avenue S., Suite 210
Birmingham, AL  35205
lgathings@gathingslaw.com
*Attorney for Donna Wright and*
*Doug Wright*

Charles A. McCallum, III
Eric D. Hoaglund
R. Brent Irby
McCallum Hoaglund Cook & Irby,
LLP
905 Montgomery Highway
Suite 201
Vestavia Hills, Alabama  35216
cmccallum@mhcilaw.com
ehoaglund@mhcilaw.com
birby@mhcilaw.com
*Attorneys for Timothy Webster,*
*Shelby Investments, LLC and*
*Cahaba Outfitters, LLC*

D. Michael Andrews
Beasley Allen Crow Methvin &
Miles, PC
218 Commerce Street
Montgomery, Alabama  36104
mike.andrews@beasleyallen.com
*Attorney for Beverly Kay*
*Willingham, Individually and as*
*Administratrix of the Estate of*
*Anthony Lee Willingham, deceased*

Glenda G. Cochran
Glenda Cochran Associates
310 Richard Arrington Jr. Blvd. N.
Suite 500
Birmingham, Alabama  35203
gc@glendacochran.com
*Attorneys for Hugh Gerald*
*DeLaughder, Jr. and Patsy Ann*
*Whatley, Individually and as*
*Administratrix of the Estate of Bill*
*Monroe Whatley, deceased*

W. Taylor Stewart
Edward McF. Johnson
Stewart & Stewart, P.C.
1021 Noble Street, Suite 110
Anniston, Alabama  36201
wts70@stewartandstewart.net
ejohnson@stewartandstewart.net
*Attorneys for Cherry Gentry, Kay*
*White, Brent Carter, and Brooke*
*Carter*

This 18th day of September, 2020.

_/s/ Alan D. Mathis_

54668595.v1