FILED

2022 Jun-24  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **OHIO SECURITY INSURANCE COMPANY and THE OHIO CASUALTY INSURANCE COMPANY,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **CIVIL ACTION NO.** **2:19-CV-1656-MHH** |
| **v.** | ) ) | |
| **SUPERIOR LAND DESIGNS, LLC, et al.** | ) ) ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT ON THE DUTY TO DEFEND AND MEMORANDUM OF LAW IN SUPPORT

Plaintiffs Ohio Security Insurance Company and The Ohio Casualty Insurance Company (collectively, the "Insurers") move for renewed summary judgment under FRCP 56 on the basis that under the terms of their liability insurance contracts with Superior Land Designs, LLC ("Superior") they have no duty to defend Superior with respect to the Underlying Lawsuits arising out of the October 31, 2016 Colonial Pipeline Company ("Colonial") gasoline release and explosion. The underlying plaintiffs claim that Superior's negligence caused their damages.

The insurance contracts at issue in this case contain two common, broadly interpreted exclusions: (1) the professional services exclusion and (2) the pollution exclusion. Based upon the allegations of the underlying complaints and discovery in

this matter, both exclusions apply and bar coverage for Superior's claims. Therefore, the Insurers do not owe any duty to defend Superior.

With respect to the professional services exclusion, the policies exclude coverage for inspection services performed by Superior. Colonial contracted with Superior to provide, and Superior did provide, inspection services for excavation and preparation work performed at the site of the gasoline release and explosion, CR-251, on October 31, 2016. Both Superior and Colonial's corporate representatives admitted that Mr. Chris Covey was acting as an inspector for Superior. Further, even if Mr. Covey's employment status is relevant to the interpretation of the professional services exclusion (which it is not), by Superior's own admissions to the State of Alabama and Superior's workers' compensation insurance carrier, Mr. Covey was an employee of Superior.

The policies' pollution exclusions also apply to preclude coverage. The pollution exclusions exclude liability for bodily injury and property damage arising out of the release of "pollutants" at any premises on which an insured (Superior) is performing operations to respond to pollutants. The inspection services Superior was performing on October 31, 2016 were being performed in response to the September 2016 gasoline leak at the CR-91 site. Patrick Dover, Superior's corporate representative, testified:

> Q:      Based upon that statement in the NTSB report, would Superior agree
>         that the work on October 31st, 2016 at CR251 was responding to the
>         September, 2016 incident?
>
> A:      Yes. Yes.

(Doc. 95, p. 104). Similarly, Juan Cazares testified on behalf of Colonial that "had the release not occurred" Superior's inspection work on October 31, 2016 "would not have been necessary." (Doc. 96, p. 116). Without a doubt, Superior's work on October 31, 2016 was in response to the September 2016 gasoline leak. The underlying plaintiffs acknowledge their injuries arose during Superior's efforts to respond to the prior September 2016 gasoline leak in the Colonial pipeline. Thus, the policies' pollution exclusions exclude coverage for Superior.

## STATEMENT OF UNDISPUTED FACTS

**September 2016 Leak**

1.      Colonial owns and operates a petroleum pipeline system that transports certain petroleum products from the Gulf Coast to various locations in the South and along the East Coast (the "Pipeline"). (Doc. 1-3, p. 3, ¶ 6; Doc. 1-4, p. 4, ¶ 11; Doc. 1-5, p. 4, ¶ 12; Doc. 1-6, p. 3, ¶ 5; Doc. 1-7, p. 4, ¶ 17).

2.      On or about September 9, 2016, in Shelby County, Alabama, more than 300,000 gallons of gasoline leaked from the Pipeline (the "September 2016 Leak"). (Doc. 1-3, p. 4, ¶ 10; Doc. 1-4, p. 4, ¶ 15; Doc. 1-5, p. 4, ¶ 16; Doc. 1-6, p. 4, ¶ 9; Doc. 1, p. 7, ¶ 29).

**Repair and Remediation of September 2016 Leak**

3.     Following the September 2016 Leak and a PHMSA Corrective Action Order, Colonial responded by repairing the Pipeline and remediating the gasoline leak, including excavating and accessing segments of the Pipeline which were not located in the immediate vicinity of the site of the September 2016 Leak. (Doc. 1-3, p. 5, ¶ 14; Doc. 1-4, p. 5, ¶ 20; Doc. 1-6, p. 5, ¶ 13; Doc. 1-5, p. 4, ¶ 17).

4.     The repair of the September 2016 Leak at CR-91 included the installation of a temporary bypass line and the subsequent removal and replacement of that bypass. (Doc. 96, pp. 95-96).

5.     As part of Colonial's response to the September 2016 Leak, Colonial planned to inject nitrogen into the line to remove the integrity concerns with the bypass. Specifically, the nitrogen injections would allow Colonial to disconnect the temporary bypass line and reconnect line 1. (*Id*. at pp.101-102).

6.     Colonial hired L.E. Bell Construction, Inc. ("L.E. Bell") to perform excavation and repairs of the Pipeline as well as preparation work at CR-251 for the CR-91 nitrogen injections. During September and October 2016, L.E. Bell assigned multiple crews in the Shelby County area to conduct the excavation and repair work. (Doc. 1-3, p. 6, ¶ 15; Doc. 1-4, p. 6, ¶ 21; Doc. 1-5, p. 4, ¶ 17; Doc. 1-6, p. 5, ¶ 14; Doc. 1, p. 7, ¶ 30, Doc. 33, p. 7, ¶ 30).

7.     The excavation and preparation work at CR-251 was being performed to expose and inspect certain thread-o-ring ("TOR") fittings on the pipeline at that location. (Doc. 96, p. 111).

8.     The TORs at CR-251 would be used for the CR-91 nitrogen injections. (*Id*. at pp.109-110).

9.     The damage to the pipeline at CR-91 caused by the September 2016 Leak was not fully repaired and was still ongoing as of the October 31, 2016 Release at CR-251. (*Id*. at pp. 117, 119).

**Master Services Agreement Between Colonial and Superior**

10.     Prior to the September 2016 Leak, Colonial and Superior entered into a Master Services Agreement ("MSA"). (*See generally* Doc. 95-5)

11.     The MSA only allowed Superior to provide employees to perform work under the MSA for Colonial unless Superior had prior written consent. (*Id*. at p. 2)

12.     Superior did not obtain prior written consent from Colonial to retain and provide independent contractors to perform work for Colonial under the MSA in 2016. (Doc. 95, pp. 79-80; Doc. 96, p. 89).

13.     The documentation between Superior and Colonial, including invoices and timesheets, refer to Chris Covey as an employee, not an independent contractor. (Doc. 95, p. 88).

14.     Pursuant to the MSA, Colonial issued two purchase orders to Superior related to the repair and remediation response at CR-91. (*See generally* Doc. 95-8; Doc. 95-10)

15.     The first purchase order, dated September 12, 2016, required Superior to provide emergency response personnel for "Shelby AL CR91" which related to the remediation cleanup at CR-91. (Doc. 95-8, p. 1; Doc. 95, p. 49)

16.     The second purchase order, dated October 25, 2016, required Superior to provide an "O.Q. qualified inspector to assist with inspection for the CR 91 pipe replacement in Loc. 401 as directed by CPC personnel" which related to the repair of the pipeline at CR-91. (Doc. 95-10, p. 1)

17.     Pursuant to the October 25, 2016 purchase order, Superior provided inspection services to Colonial at the CR-91 and CR-251 sites. (Doc. 95, pp. 51, 54, 63).

18.     Pursuant to the October 25, 2016 purchase order and the MSA, Superior provided an inspector, Chris Covey, to work on behalf of Superior for Colonial. (Doc. 95, pp. 47, 50, 116; Doc. 96, pp. 113, 115).

19.     Colonial contracted with Superior for inspection work at CR-251 and did not contract with Mr. Covey. (Doc. 95, p. 100).

20.     Superior was responsible to Colonial for the work performed by Mr. Covey at CR-251. (Doc. 95, pp. 96-97; Doc. 96, pp.111-112).

21.     Colonial paid Superior, not Mr. Covey, for the inspection work done at CR-251. (Doc. 96, pp. 155, 157).

**October 2016 Release**

22.     Superior provided Mr. Covey with training, information and background related to the CR-251 work and instructed Mr. Covey when and where to report to Colonial's worksites on October 31, 2016. (Doc. 95, pp. 24, 91-92, 99).

23.     In a statement provided to the National Transportation Safety Board, Mr. Covey stated that he met with another Superior inspector on the evening of October 30, 2016 to discuss his role and review procedures for the job on October 31, 2016. (Doc. 97-1, p. 10).

24.     On October 31, 2016, Mr. Covey was present at the CR-251 site as the third-party inspector. (Doc. 96, pp. 112-113).

25.     During the excavation and preparation work at the CR-251 site on October 31, 2016, which included attempting to uncover the TORs for the CR-91 nitrogen injections, the excavator struck the Pipeline which produced a release of flammable gasoline. (*See* Doc. 1-3, p. 14, ¶¶ 41-43; Doc. 96, p. 111).

26.     The gasoline ignited which resulted in an explosion that caused bodily injury, loss of life, and property damage (the "Release"). (*Id.*)

27.     The work on October 31, 2016 at CR-251 was being performed in response to the September 2016 Leak. (Doc. 95, p. 113).

28.   The work on October 31, 2016 at CR-251 would not have been performed if the September 2016 Leak had not occurred. (Doc. 95, p. 104; Doc. 96, pp. 116-117, 122, 123).

**Superior's Workers' Compensation Claim for Mr. Covey**

29.   As an employee of Superior, Mr. Covey was covered under Superior's workers' compensation insurance policy with CNA Insurance. (Doc. 95, p. 90).

30.   After Mr. Covey was injured in the October 31, 2016 release and explosion, Superior submitted a workers' compensation claim to CNA for Mr. Covey. (*Id*. at p. 114).

31.   In the communications with CNA, Superior repeatedly referred to Mr. Covey as an employee, not an independent contractor. (*Id*. at pp. 115, 121).

32.   In documents submitted to the State of Alabama for purposes of workers' compensation, Superior consistently identified Mr. Covey as an employee of Superior. (Doc. 97-2, p. 2; Doc. 95-18, p. 2).

**Underlying Lawsuits**

33.   The Underlying Lawsuits allege Superior failed to conduct an adequate inspection of the excavation site, prepare an adequate plan for the excavation, perform a job hazard analysis, enforce all applicable regulations and procedures, and conduct a safety meeting to identify hazards and what actions should be taken in the event the Pipeline was struck. (Doc. 1-3, p. 13, ¶ 37; Doc. 1-4, p. 10, ¶ 38).

34.    The Underlying Lawsuits also allege Superior's negligence proximately caused the plaintiffs' injuries. (Doc. 1-3, p. 33-34, ¶¶ 72-73, 75; Doc. 1-4, p. 17, ¶ 89; Doc. 1-5, p. 24, ¶ 79; Doc. 1-6, p. 20-22, ¶¶ 61-62, 64; Doc. 1-7, p. 6, ¶ 33).

35.    As a result of the Release, certain lawsuits were brought against Superior, and others, seeking damage. (Doc. 1-3; Doc. 1-4; Doc. 1-5; Doc. 1-6; Doc. 1-7). These lawsuits will be referred to as the "Underlying Lawsuits."

**The Superior Policies**

36.    Ohio Security issued a commercial general liability insurance policy bearing policy number BKS(17)56089339, for the policy period from July 5, 2016 to July 5, 2017, to Superior ("Ohio Security Policy"). (Doc. 1-9, p. 47).

37.    Ohio Security's Policy describes Superior's business as "ENGINEER INSPECTING PIPELINES." (*Id*.)

38.    The Ohio Security Policy contains a Pollution Exclusion that provides that "This insurance does not apply to:"

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

\*      \*      \*

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for,

monitor, clean up, remove, contain, treat, detoxify or neutralize, *or in any way respond to*, or assess the effects of, "pollutants".

(*Id*. at pp. 63-64) (emphasis added).

39.     The Ohio Security Policy defines "Pollutants", in relevant part, to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, [and] chemicals …."  (*Id*. at p. 76).

40.     The Ohio Security Policy also contains a Professional Liability Exclusion that states:

> **EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY**
>
> The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**
>
> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services *by you* or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.
>
> Professional services include:
>
> **1.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
>
> **2.** Supervisory, *inspection*, architectural or engineering activities.

10

> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

(*Id.* at p. 82) (emphasis added).

41.     Ohio Casualty issued a commercial umbrella insurance policy bearing policy number USO(17)56089339, for the policy period from July 5, 2016 to July 5, 2017, to Superior ("Ohio Casualty Policy"). (Doc. 1-10, p. 29).

42.     The Ohio Casualty Policy contains a specific Pollution Exclusion that provides that "insurance does not apply to"

> **L. 1.** "Bodily injury", "property damage", "personal injury", "advertising injury" or "personal and advertising injury" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

* * *

> Paragraph **1.** of this exclusion **L.** does not apply to the following:

* * *

> **(4)** "Bodily injury" or "property damage" arising out of the discharge, dispersal, seepage, migration, release or escape of "pollutants" at or from any premises, site or location on which any "Insured" or any contractors or subcontractors working directly or indirectly on any "Insured's" behalf are performing operations if the "pollutants" are not brought

11

on or to the premises, site of location in connection with such operations by such "Insured", contractor or subcontractor.

\* \* \*

However, the exceptions to this exclusion **L.** in paragraphs … **(4)** … above apply only to the extent that insurance is afforded for such "bodily injury" or "property damage" by "underlying insurance".  Provided, however, that the coverage afforded by this policy will be no broader than the coverage afforded by such "underlying insurance":

Regardless of the extent of "underlying insurance", none of the exceptions to this exclusion **L.** in paragraphs … **(4)** … above apply with respect to "bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape or (*sic*) "pollutants":

\* \* \*

**(iii)**   At or from any premises, site or location on which any "Insured" or any contractors or subcontractors working directly or indirectly on any "Insured's" behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, *or in any way respond to*, or assess the effects of, "pollutants".

(*Id*. at p. 70) (emphasis added).[1]

43.     The Ohio Casualty Policy defines "Pollutants", in relevant part, to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, [and] chemicals …." (*Id*.)

---

[1] Here the exception to the exception applies because the Underlying Lawsuits allege that at the time of the Release, Superior was performing operations to respond to the September Leak.

44.     Pursuant to an endorsement, the Ohio Casualty Policy also contains an

"ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

EXCLUSION" which states:

> This insurance does not apply to:
>
> Any liability arising out of the rendering of or failure to render any professional services *by you* or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.
>
> Professional services include:
>
> 1. the preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
>
> 2. supervisory, *inspection*, architectural or engineering activities.
>
> This exclusion applies even if the "claims" against any "Insured" allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that "Insured," if the "occurrence," "offense" or other act, error or omission involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.
>
> This endorsement does not change any other provision of the policy.

(*Id*. at p. 53) (emphasis added).

45.     Both Policies were countersigned and delivered to Superior in the State

of Georgia. (Doc. 1-10, p. 29; Doc. 1-9, p. 47).

46.     Superior is the named insured under both Policies. (*Id*.)

47.    Superior sought a defense of the Underlying Lawsuits from Ohio Security and Ohio Casualty under the Policies. (Doc. 1, p. 11, ¶ 46; Doc. 33, p. 10, ¶ 46).

48.    Ohio Security and Ohio Casualty agreed to participate in the defense of Superior against the Underlying Lawsuits under a full reservation of rights. (Doc. 1, p. 11, ¶ 47; Doc. 33, p. 10 ¶ 47).[2]

## **STANDARD OF REVIEW**

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In determining whether a genuine issue for trial exists, the court must view the evidence in the light most favorable to the non-movant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing

---

[2] Superior's professional liability insurer is also providing Superior a defense in the Underlying Lawsuits pursuant to the coverage it provides. (Doc. 95, pp. 30, 125).

court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing 'party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## ARGUMENT AND CITATION TO AUTHORITY[3]

### A.    There Is No Duty to Defend If There Is No Coverage.

To determine whether a claim against an insured falls within the insured's coverage, triggering the insurer's duty to defend, courts compare the allegations of the underlying complaint against the provisions of the policy. *See Travelers Prop. Cas. Co. of Am. v. Kansas City Landsmen*, L.L.C., 592 F. App'x 876, 881–82 (11th Cir. 2015). If the complaint against the insured does not assert any claim that could fall within the policy's coverage, the insurer is justified in refusing to defend. *See id.*

---

[3] Georgia law governs the interpretation of the Policies because the Policies were delivered to Superior and its retail agent in Georgia. *See Lancer Ins. Co. v. Newman Specialized Carriers, Inc.*, 903 F. Supp. 2d 1272, 1278-79 (N.D. Ala. 2012) (holding that, in determining which state's law applies in a contract dispute, Alabama follows the principle of *lex loci contractus*, applying the law of the state where the contract was formed, and when an insured's policy was delivered in Alabama, Alabama law applied). (Doc. 1-9, p. 23).

**B.     The Professional Services Exclusions Bar Coverage for Liability Arising Out of Inspection Activities Performed by Superior.**

The Policies' professional services exclusions exclude coverage for, among other things, liability arising out of the rendering or failure to render "professional services" by "you." "You" is defined as the Named Insured, Superior. The definition of "professional services" includes "inspection" activities. The Underlying Lawsuits all allege that Superior is liable for damages based on its negligence and failure to properly inspect L.E. Bell's excavation activities at the CR-251 site. (*See, e.g.,* Doc. 1-3, p. 15-16, ¶ 50; Doc. 1-4, p. 17, ¶ 89; Doc. 1-5, p. 24, ¶ 79; Doc. 1-6, p. 20-22, ¶¶ 61-62, 64; Doc. 1-7, p. 6, ¶ 33).

Georgia courts have held that professional services exclusions, like the exclusions in the Policies, are unambiguous and enforceable. *See Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co.*, 297 Ga. App. 751, 755-56 (2009) (reversing a trial court's denial of summary judgment to two insurers and ruling they had no duty to defend policyholders because the alleged negligence in the underlying complaint fell within the professional services exclusion); *Batson-Cook Co. v. Aetna Ins. Co.*, 200 Ga. App. 571, 573 (1991) (holding claim was barred by professional services exclusion because allegations pertained to the insured's rendering or failing to render the services it was retained to perform as a construction manager).

As in *Auto-Owners* and *Batson-Cook*, Superior was allegedly negligent in its professional services (in this case, inspection activities). There is no dispute that

Superior, though Chris Covey, provided inspection services to Colonial on October 31, 2016 at the CR-251 site. Because Superior's liability in this matter is based on its alleged negligence and/or failure to properly inspect excavation activities, the professional services exclusions bar coverage for Superior, regardless of Chris Covey's employment status or the title of the exclusions.

### 1. Superior Provided Inspection Services to Colonial on October 31, 2016.

It is undisputed that Superior provided inspection services to Colonial on the day of the Release pursuant to a purchase order issued to Superior by Colonial. (Doc. 95, pp. 47, 50; Doc. 96, pp. 113, 115). Specifically, this purchase order required Superior to provide an "O.Q. qualified inspector to assist with inspection for the CR 91 pipe replacement in Loc. 401 as directed by CPC personnel." (Doc. 95-10, p. 1). It is also undisputed that Superior provided Chris Covey to work as an inspector on behalf of Superior and to fulfill Superior's obligations under the Purchase Order. (Doc. 95, pp. 47-48; Doc. 96, pp. 113, 115).

Further, Colonial contracted with Superior – not Chris Covey – for inspection services to be performed at CR-251 on October 31, 2016. (Doc. 95, p. 100). Colonial made payments for this work to Superior – not Chris Covey. (Doc. 96, pp. 155, 157). Superior was ultimately responsible to Colonial for the inspection work at CR-251 regardless of who performed the work. (Doc. 95, pp. 96-97; Doc. 96, pp. 111-112).

And Superior admits Chris Covey was working at the CR-251 site as an inspector on Superior's behalf. (Doc. 95, p. 116).

> **2.   Chris Covey Was an Employee of Superior and Not an Independent Contractor.**

Because Superior provided inspection services to Colonial, Mr. Covey's employment status with Superior is irrelevant to the determination of whether the professional services exclusions apply. However, even if this Court determines Mr. Covey's employment status is relevant, Mr. Covey was an employee of Superior, not an independent contractor.

Superior's contention that Mr. Covey was an independent contractor is inconsistent with every other statement made by Superior prior to litigation. At all times prior to litigation, including during Superior's communications with the State of Alabama and Superior's workers' compensation insurer, Superior represented in no uncertain terms that Mr. Covey was an employee of Superior. For example, in documents filed with the State of Alabama's Workers' Compensation Board, Superior:

- listed Mr. Covey as an "employee" with weekly wages. (*See* Doc. 95-18);

- completed a "Job Function Evaluation" Report for Mr. Covey that identified Mr. Covey as a full-time employee. (*See* Doc. 97-2, p. 2).

When applying for workers' compensation coverage on behalf of Mr. Covey under its policy with CNA, Superior identified Mr. Covey as an employee and included Mr. Covey's payroll in its workers' compensation application. (Doc. 95, p. 120). In an email to CNA, Mr. Dover of Superior stated: "Chris Covey was a contract employee. His payroll was included in the amount listed on the application as well as the other contractors." (Doc. 95-19, p. 2). When confronted with this document at deposition, Dover testified that he believed a "contract employee" and "independent contractor" were the same thing.  (Doc. 95, p. 122).  However, Dover said no such thing to the State of Alabama or to Superior's workers' compensation insurer, CNA. After Superior filed Mr. Covey's workers' compensation claim, CNA questioned whether it would provide coverage for Mr. Covey because it appeared Mr. Covey was not a Superior employee. (Doc. 95-19, p. 2). In response, Superior advised that Mr. Covey was indeed an employee. (*Id*.) Superior never stated to CNA at any point that Mr. Covey was an independent contractor. (Doc. 95, p. 121). CNA ultimately provided workers' compensation coverage to Mr. Covey. In light of Superior's admissions to the state of Alabama and CNA, the undisputed evidence shows that Mr. Covey was an employee of Superior.[4]

---

[4] Consistent with Superior's admissions, Superior treated Mr. Covey as an employee. In Georgia, whether a person is an employee or an independent contractor is determined by "examining whether the employer has assumed the right to control the time, manner, and method of executing the work." *Wilson v. Guy*, 356 Ga. App. 509, 512–13, 848 S.E.2d 138, 142 (2020). Here, Superior assumed the right to control Mr. Covey's work. According to Mr. Dover, Superior provided training to Mr. Covey, including Operator Qualifications training. (Doc. 95, p. 24). Superior paid

Further, the Master Services Agreement between Superior and Colonial does not allow Superior to subcontract any work or allow independent contractors to perform any work unless prior written approval was provided by Colonial. (Doc. 95-5, p. 2). Accordingly, pursuant to the Master Services Agreement, Colonial expected Superior's inspectors would be Superior employees. (Doc. 96, p. 88). Colonial did not provide written consent to Superior allowing Superior to provide independent contractors pursuant to the MSA. (Doc. 96, p. 89; Doc. 95, pp. 79-80). And no documentation between Superior and Colonial, including invoices and timesheets, refer to Mr. Covey as an independent contractor. Rather, the documentation refers to him as an employee of Superior. (Doc. 95, p. 88).

Although Superior attempted to characterize Mr. Covey as an independent contractor in its prior opposition to the Insurers' initial motion for summary judgment, prior to this litigation, Superior treated Mr. Covey as an employee, including in its representations to the State of Alabama, its own insurance carrier, and its client, Colonial.

---

Mr. Covey (*Id*. at p. 89), told Mr. Covey to report at Colonial's worksites at specific times (*Id*. at pp. 91-92), and told Mr. Covey he would be performing work as an inspector at the CR-251 site (*Id*. at p. 99). Mr. Covey also met with another Superior inspector to discuss his role and review procedures for the job on October 31, 2016. (Doc. 97-1, p. 10)

### 3. The Language of the Professional Services Exclusions, Not the Title, Governs the Application to Include Inspection Services.

The titles of the professional services exclusions do not limit their applications solely to "architects, engineers, or surveyors." Rather the language of the exclusions themselves, which expressly define "professional services" to include "inspection," govern their application. Although the exclusions include engineers, architects and surveyors, the exclusions do not contain any language that limits their applications solely to these professions.

Applying the professional services exclusions to include inspection services by Superior comports with Georgia's rules of contract interpretation. "The first rule that courts must apply when construing contracts is to look to the plain meaning of the words of the contract," *Ga. Real Estate Props., Inc. v. Lindwall*, 303 Ga. App. 12, 14, 692 S.E.2d 690, 692 (2010) (footnote omitted), and "[i]t is a cardinal rule of contract construction that a court should, if possible, construe a contract so as not to render any of its provisions meaningless and in a manner that gives effect to all of the contractual terms." *Northwest Plaza, LLC (MI) v. Northeast Enterprises, Inc.*, 305 Ga. App. 182, 189, 699 S.E.2d 410, 416 (2010).

The Policies' professional services exclusions bar coverage for property damage and bodily injury arising out of the rendering or failure to render "*any* professional services" by "you" – which is defined as Superior. If the exclusion

21

applied only to engineers, architects, and surveyors, the word "you," meaning the Named Insured, Superior, would be superfluous and meaningless. Further, the exclusion defines the term "professional services" to include various activities, including: "[s]upervisory, inspection, architectural or engineering activities." If the exclusion was read to apply only to architects, engineers and surveyors, then such an interpretation would not be reading the exclusion as a whole and would be ignoring certain words of that exclusion – i.e., "supervisory" and "inspection" activities, in addition to "architectural" and "engineering," -- in the definition of "Professional Services."

Federal courts in multiple jurisdictions have specifically found that similar exclusions are not limited to engineering, architectural, and surveying services, despite their titles. *See Hermitage Ins. Co. v. Brewer*, 57 F. App'x 210 (5th Cir. 2002); *Navigators Specialty Ins. Co. v. Beltman*, No. 11-CV-00715-RPM, 2012 WL 5378750, at *11 (D. Colo. Nov. 1, 2012).

In *Hermitage*, the insureds argued that the professional services exclusion was ambiguous because the title of the exclusion suggested that it only applied to engineers, architects, or surveyors, while the text of the exclusion was broader, and that this ambiguity should be resolved in their favor. 57 F. App'x 210. The court disagreed, specifically stating that "the mere fact that the parties disagree about the meaning of a provision does not make the provision ambiguous" and citing the

"general rule" that while a caption may be used to explain an ambiguity in the "operative part of the clause," it should not be used to "create ambiguity where none exists." *Id*. The court held the exclusion was not ambiguous and applied to consulting and maintenance services rendered by the insureds. *Id*.

Similarly, in *Navigators*, the court considered an almost identical professional services exclusion as the exclusions at issue. The exclusion was titled "Exclusion— Engineers, Architects or Surveyors Professional Liability" and amended the policy to exclude coverage for "'personal and advertising injury' arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity." 2012 WL 5378750, at *9. Like the Policies here, professional services were defined to include: "[t]he preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and[s]upervisory, inspection, architectural or engineering activities." *Id*. Although the professional services at issue in *Navigators* were legal services, and were not specifically designated in the exclusion itself, the court held that because this endorsement excluded coverage for claims that "aris[e] out of ... any professional services by [the insureds]," and the allegations against the insured arose out of the insureds' provision of professional services to the plaintiffs' lawyers in a lawsuit, this endorsement barred coverage.

As discussed above, Superior provided inspection services, which are defined as professional services in the Policies. Based on the holdings in *Navigators* and *Hermitage*, there is an even stronger basis that the professional services exclusion should apply to bar coverage for Superior's claims.

Although one North Carolina state court case, *Cowell v. Gaston Co.*, 190 N.C. App. 743, 748 (2008), found a professional services exclusion ambiguous, the weight of authority shows that this exclusion does not apply solely to engineers, architects, and surveyors. Additionally, part of the Court's reasoning in *Cowell* was based on another, broader, exclusion in another policy issued by the same insurer to the insured that excluded "any other professional service by an insured." 190 N.C. App. at 749. The court found that this showed the insurer knew how to include a broader professional services exclusion. There is no such broader exclusion in the Policies at issue here.

### C.    The Policies' Pollution Exclusions Bar Coverage Because Superior's Work Was in Response to the September 2016 Leak.

The Policies' pollution exclusions also bar coverage for Superior because the underlying plaintiffs' bodily injury and property damage claims resulted from the gasoline release and explosion caused by Superior's efforts to respond to an earlier gasoline leak. In pertinent part, the Pollution Exclusion provides that the Ohio Security Policy does not apply to "bodily injury" or "property damage" caused by "pollutants" at a location where the insured's operations are to "in any way respond

to … pollutants." (Doc. 1-9, pp. 63-64). Similarly, the Ohio Casualty Policy includes a Pollution Exclusion that excludes coverage for "bodily injury" or "property damage" that "would not have occurred in whole or in part but for" pollutants. (Doc. 1-10, p. 70).[5]

Pollution exclusions are enforced under Georgia law, and the Supreme Court of Georgia has held that pollution exclusions are unambiguous.[6] *Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 721 (2016); *Reed v. Auto-Owners Ins. Co.*, 284 Ga. 286, 288 (2008). The Court has also applied pollution exclusions broadly, rejecting the notion that the pollution exclusion is limited to industrial and/or environmental harm. *Smith*, 298 Ga. at 720.   Further, gasoline has been explicitly held to constitute a "pollutant" under Georgia law. The Policies define the term "pollutants," in relevant part, to mean "any solid, liquid, gaseous or thermal

---

[5] As this Court recognized in its October 15, 2021 Order, if the allegations in the Underlying Lawsuits that Superior's work on October 31, 2016 was part of the remediation or response to the September 2016 Leak are true, the Policies' pollution exclusions may apply to bar coverage for Superior's claims. (Doc. 80, p. 11).

[6] Although Georgia courts have not yet considered the specific wording of the applicable provisions of the Policies' pollution exclusions, other jurisdictions have upheld these provisions. In *ACSTAR Ins. Co. v. Clean Harbors, Inc.*, the court considered an almost identical pollution exclusion. 783 F. Supp. 2d 312, 322 (D. Conn. 2011). In that case, the insured subcontractor had been retained by a contractor to perform work "in furtherance of pollution testing and monitoring" the contractor was retained to conduct. *Id*. The court determined that "it [was] impossible to disentangle" the subcontractor's drilling work from the contractor's testing. *Id*.   Thus, the court found that the pollution exclusion "bar[red] coverage of claims arising from the process of testing and monitoring, which, in the case of underground pollution, must include boring to extract a sample to be tested and/or to install equipment to monitor for the presence of pollutants." *Id*.

irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, [and] chemicals." In *Truitt Oil & Gas*, the Court of Appeals of Georgia determined that gasoline that had leaked from a storage container and, as a result, contaminated the surrounding environment, constituted a "pollutant" within the meaning of the subject policy, notwithstanding the fact that the policy did not specifically list "gasoline" in its definition of "pollutant." 231 Ga. App. at 90. The flammable gasoline involved in both the September 2016 Leak and the Release, which is alleged to have caused bodily injury and property damage, similarly falls within the Policies' definition of "pollutants."

Georgia courts also broadly interpret the phrase "arising out of." *See JNJ Found. Specialists, Inc. v. D.R. Horton, Inc.*, 311 Ga. App. 269, 270 (2011) ("Importantly, the term 'arising out of' does not mean proximate cause in the strict legal sense, nor [does it] require a finding that the injury was directly and proximately caused by the insured's actions. Almost any causal connection or relationship will do."). The term "arising out of" in the context of insurance policy exclusions refers to the "but for" causation used to determine tort liability. *See Hays v. Ga. Farm Bureau Mut. Ins. Co.*, 314 Ga. App. 110, 114 (2012). With regard to pollution exclusions, Georgia courts have held that it would be a mistake to read "but-for" causation to mean "sole causation." *Evanston Ins. Co. v. Sandersville R.R. Co.*, No. 5:15-CV-247 (MTT), 2016 WL 5662040, at *9 (M.D. Ga. Sept. 29, 2016).

26

Rather, "but-for causation broadly defines causation, requiring only an act or omission without which the event would not have occurred." *Id*.

Superior admits that its work on October 31, 2016 at CR-251 was responding to the September 2016 Leak. (Doc. 95, p. 113). Additionally, both Superior and Colonial admit that the work performed at CR-251 on October 31, 2016 would not have occurred if the September 2016 Leak had not occurred. (Doc. 95, p. 104; Doc. 96, pp. 116, 122, 123). Colonial also confirmed that the October 25, 2016 purchase order that required Superior to provide an inspector to "assist with inspection for the *CR 91 pipe replacement*" covered the work Superior performed at the CR-251 location on October 31, 2016. (Doc. 95-10, p. 1; Doc. 96, pp. 74-75) (emphasis added).[7]

Accordingly, there is no dispute that Superior's inspection work at CR-251 on October 31, 2016 was a continuing part of efforts to "respond to" the September 2016 Leak and would not have occurred but for the September 2016 Leak. Thus, at the time of the Release, Superior was acting as an inspector as part of Colonial's overall response efforts to respond to the September 2016 Leak, and the underlying plaintiffs' alleged injuries and/or damages "arose out of" these activities.

---

[7] Additionally, by Colonial's own admission in a coverage action against its pollution insurance carrier, its effort "to respond" to the September 2016 Leak "was ongoing on October 31, 2016" in the Shelby County area when the Release occurred. (Doc. 97-3, p. 4).

Accordingly, the Policies' pollution exclusions bar coverage for Superior for such bodily injury and/or property damage.

## CONCLUSION

Plaintiffs respectfully request that the Court enter an Order granting summary judgment in favor of Plaintiffs and declare that Plaintiffs have no duty to defend Superior with respect to the Underlying Lawsuits. Additionally, Plaintiffs request that the Court grant such further relief as the Court deems just and proper.

This 24th day of June, 2022.

**ZELLE LLP**

*/s/ James V. Chin*

James V. Chin (*admitted pro hac vice*)
Ga. Bar No. 124827 (jchin@zelle.com)
Seth V. Jackson (*admitted pro hac vice*)
BBO #658669 (sjackson@zelle.com)
1201 W. Peachtree Street NW, Suite 610
Atlanta, GA 30309
(470) 867-3040
(612) 336-9100 Fax

*/s/ Michelle L. Crunk*

**DODSON GREGORY, LLP**

John W. Dodson (jwd@dodsongregory.com)
(ASB-9724-D65J)
Michelle L. Crunk (mlc@dodsongregory.com)
(ASB-2967-I71C)
PO Box 530725
Birmingham, AL 35253
(205) 834-9171
(205) 278-8718 Fax

*Attorneys for OHIO SECURITY INSURANCE*
*COMPANY and THE OHIO CASUALTY*
*INSURANCE COMPANY*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 24th day of June, 2022, a true and correct copy

of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ Michelle L. Crunk*

OF COUNSEL